UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

JESSE WYNGAARD,

Plaintiff,

v. Case No. 19-cv-493-pp

WOODMAN'S FOOD MARKET, INC.,

Defendant.

---

MARY HUNTER and JACKLYN BEEGUN,

Plaintiffs,

v. Case No. 21-cv-94

WOODMAN'S FOOD MARKET, INC.,

Defendant

---

TERRY ROBERTSON and RAY BARNES,

Plaintiffs,

v. Case No. 22-cv-207

WOODMAN'S FOOD MARKET, INC.,

Defendant

---

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT (DKT. NO. 340) AND GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT (DKT. NO. 344)**

---

This case involves three consolidated class and Fair Labor Standards Act (FLSA) collective actions against defendant Woodman's Food Market, Inc. The plaintiffs and the defendant have filed cross motions for partial summary judgment. Dkt. Nos. 340, 344. The court will grant in part and deny in part the parties' summary judgment motions.

## I. Background

Woodman's is an employee-owned grocery store that "provides a wide variety of grocery items at nineteen large grocery stores in Wisconsin and Illinois." Dkt. No. 383 at ¶1. The named plaintiffs in this case are, and represent, employees of the defendant. Dkt. No. 295 at 2-9.

On April 5, 2019, Jesse Wyngaard filed a class and collective action, alleging that the defendant had violated FLSA and Wisconsin Wage Payment and Collection laws (WWPCL). Wyngaard v. Woodman's Food Market, Inc., Case No. 19-cv-493, Dkt. No. 1 (Wyngaard). On January 22, 2021, Mary Hunter and Jaclyn Beegun (collectively, Hunter), represented by the same attorneys as Wyngaard, filed their own class and collective action alleging the same FLSA and WWPCL violations during a different period. Hunter, *et al.* v. Woodman's Food Market, Inc., Case No. 21-cv-94, Dkt. No. 1 (Hunter). On December 13, 2021, Terry Robertson and Ray Barnes (collectively, Robertson), who are represented by the same attorneys as Wyngaard and Hunter, filed a class and collective action in the Northern District of Illinois, alleging that the defendant had violated the FLSA, the Illinois Minimum Wage Law (IMWL) and the Illinois

Wage Payment and Collection Act (IWPCA). Robertson, *et al.* v. Woodman's Food Market, Inc., Case No. 22-cv-207, Dkt. No. 1 (Robertson).

In December 2021, the court consolidated Wyngaard and Hunter through rulings on summary judgment. Wyngaard, Dkt. No. 230. In early 2022, the parties stipulated to the transfer of the Robertson case to the Eastern District of Wisconsin, and this court consolidated Robertson with Wyngaard and Hunter. See Robertson, Dkt. No. 11. Wyngaard is the lead case.[1]

On October 6, 2023, the court granted the parties' motions to certify the class and collective actions. See Dkt. No. 295. There are three core allegations that form the basis for the various federal and state law claims made by the plaintiffs in their subclasses and FLSA collectives: (1) the defendant did not provide its employees with thirty-minute meal periods, (2) the defendant shaved time off its employees' timesheets through its rounding and no-fault attendance policies and (3) the defendant failed to include non-discretionary bonuses in calculating its employees' overtime pay. The plaintiffs express these core allegations through FLSA collectives and subclass actions and the corresponding claims, which are summarized below.

A. The Wyngaard and Hunter Subclasses and Wisconsin State Law Claims

There are three subclasses defined in Wyngaard and Hunter: (1) the WWPCL Meal Period Subclass, (2) the WWPCL Timeshaving Subclass and (3) the WWPCL Non-Discretionary Compensation Subclass. Dkt. No. 295 at 3-4.

[1] Unless otherwise noted for the remainder of this decision, the court will cite to the docket in Wyngaard.

For the WWPCL Meal Period Subclass, Wyngaard and Hunter assert two Wisconsin state law claims: (1) the defendant violated the WWPCL by failing to pay Wisconsin employees for meal periods lasting less than thirty minutes and (2) the defendant violated the WWPCL by failing to include this pay in the Wisconsin employees' overtime pay. Dkt. No. 247 at 35-36, Dkt. No. 248 at 37-38. For the WWPCL Timeshaving Subclass, Wyngaard and Hunter allege that the defendant violated the WWPCL by failing to include the shaved time in its Wisconsin employees' overtime pay. Dkt. No. 247 at 36-37, Dkt. No. 248 at 39-40. For the WWPCL Non-Discretionary Compensation Subclass, Wyngaard and Hunter allege that the defendant violated the WWPCL by failing to include attendance bonuses, employee appreciation holiday bonuses and new hire bonuses in its Wisconsin employees' overtime calculations. Dkt. No. 247 at 38-40, Dkt. No. 248 at 41-42.

B. The Robertson Subclasses and Illinois State Law Claims

There are three subclasses defined in Robertson: (1) the IWPCA Timeshaving Subclass, (2) the IMWL Timeshaving Subclass and (3) the IMWL Non-Discretionary Compensation Subclass. See Dkt. No. 295 at 7-8. Robertson alleges on behalf of the IWPCA Timeshaving Subclass that the defendant violated the IWPCA by failing to compensate its Illinois employees for their regular rate by shaving time from its employees' timesheets. See Dkt. No. 248 at 42-44, Dkt. No. 249 at 27-29. For the IMWL Timeshaving Subclass, Robertson alleges that the defendant violated the IMWL by failing to compensate its Illinois employees for their overtime rate by shaving time from

its employees' timesheets. Dkt. No. 248 at 44-46, Dkt. No. 249 at 29-31. For the IMWL Non-Discretionary Compensation Subclass, Robertson alleges that the defendant violated the IMWL by failing to include attendance bonuses, employee appreciation holiday bonuses and new hire bonuses in its Illinois employees' overtime calculations. Dkt. Nos. 248 at 44-46, 249 at 29-31.

C. The FLSA Collective Claims

In their motion to certify subclasses for the state claims, the parties did not propose definitions for the FLSA collectives. The plaintiffs' amended complaints in Wyngaard, Hunter and Robertson allege different FLSA collective definitions, but the corresponding FLSA claims overlap the state claims.

Wyngaard and Hunter allege that the defendant violated the FLSA by failing to compensate its Wisconsin employees for meal periods lasting less than thirty minutes, thereby failing to compensate them for overtime. Dkt. No. 247 at 21, 28-30; Dkt. No. 248 at 19-20, 31-33. Wyngaard and Hunter allege that the defendant violated the FLSA through its alleged timeshaving practice by depriving its Wisconsin employees of proper overtime pay. Dkt. No. 247 at 21, 30-32; Dkt. No. 247 at 19-20, 33-35. And Wyngaard and Hunter allege that the defendant violated the FLSA by failing to include attendance bonuses, employee appreciation holiday bonuses and new hire bonuses in its Wisconsin employees' overtime pay. Dkt. No. 247 at 21, 32-34; Dkt. No. 248 at 19-20, 35-37.

Robertson alleges that the defendant violated the FLSA through its alleged timeshaving practice by depriving its Illinois employees of proper

overtime pay. Dkt. No. 249 at 17, 23-25. Robertson also alleges that the defendant violated the FLSA by failing to include attendance bonuses, employee appreciation holiday bonuses and new hire bonuses in its Illinois employees' overtime pay. Id. at 17, 25-27.

## II. Motions for Partial Summary Judgment (Dkt. Nos. 340, 343)

The defendant moves for summary judgment on the following claims in the amended complaint filed by each plaintiff:

- Wisconsin Plaintiffs are owed for meal breaks clocked in for less than 30 minutes, in violation of the Wisconsin's Wage Payment and Collection Law ("WWPCL");

- Plaintiffs were denied pay for compensable time due to timeclock rounding, in violation of the Fair Labor Standards Act ("FLSA"), the WWPCL, Illinois' Minimum Wage Law ("IMWL"), and Illinois' Wage Payment and Collection Law ("IWPCL");

- Plaintiffs were not compensated at the correct overtime rate because [the defendant] did not include the Holiday Appreciation Bonus in the regular rate, in violation of the FLSA; and

- Illinois Plaintiffs are owed for the difference between scheduled meal breaks and time clocked out for meal breaks, in violation of the IMWL and IWPCL.[2]

Dkt. No. 340 at 2.

The defendant makes four broad arguments in support of its motion: (1) "Plaintiffs were relieved of duty for a full 30-minute meal break"; (2) "Any rounding was *de minimis* and largely in Plaintiff's favor"; (3) "Holiday Appreciation Bonuses were properly excluded from the regular rate of pay"; and

[2] Robertson did not allege any Illinois law-based meal break claims, so the court will not address the defendant's briefing on that issue.

(4) "Illinois employees are not entitled to the difference between a scheduled and an actual meal break." Dkt. No. 341 at 2.

The plaintiffs' summary judgment motion did not clearly identify the claims for which the plaintiffs are seeking partial summary judgment as to liability. But based on their briefing in support of their motion (see dkt. no. 380 at 2), it appears that the plaintiffs seek partial summary judgment on all their claims except the Wyngaard and Hunter FLSA collective meal period claims.

## III. Summary Judgment Standard

A party is entitled to summary judgment if it "shows that there is no genuine dispute as to any material fact and [it] is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) ("By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." (emphasis in original)). "Material facts" are those that "might affect the outcome of the suit." See Anderson, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." Id.

When reviewing a motion for summary judgment, the court views the record and draws all reasonable inferences from it in the light most favorable to the non-moving party. Khungar v. Access Cmty. Health Network, 985 F.3d 565, 572-73 (7th Cir. 2021). The court cannot weigh evidence or make credibility

determinations on summary judgment because those tasks are left to the fact-finder. Miller v. Gonzalez, 761 F.3d 822, 827 (7th Cir. 2014). The court is required to consider only the materials cited by the parties, see Fed. R. Civ. P. 56(c)(3); it is not required to "scour every inch of the record" for evidence that is potentially relevant. Grant v. Trs. of Ind. Univ., 870 F.3d 562, 573-74 (7th Cir. 2017).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." Id. at 325.

When reviewing cross-motions for summary judgment, all reasonable inferences are drawn in favor of the party against whom the motion at issue was made. Valenti v. Lawson, 889 F.3d 427, 429 (7th Cir. 2018) (citing Tripp v. Scholz, 872 F.3d 857, 862 (7th Cir. 2017)). The existence of cross-motions for summary judgment does not imply that there are no genuine issues of material fact. R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Eng'rs, Local Union 150, AFL-CIO, 335 F.3d 643, 647 (7th Cir. 2003).

## IV. The FLSA, WWPCL and IMWL Bonus Pay Claims

There are three bonuses at issue: the defendant's Attendance Bonus, its New Hire Bonus and its Employee Appreciation Holiday Bonus. Wyngaard and Hunter allege that the defendant violated the WWPCL by failing to include the bonuses in the overtime calculations. Dkt. Nos. 247 at 38-40, 248 at 41-42. Robertson asserts the same claim under the IMWL. Dkt. Nos. 248 at 44-46, 249 at 29-31. Each of the three FLSA collectives alleges that the defendant failed to include the bonuses in overtime under FLSA. Dkt. No. 247 at 25-72, 32-37.

The defendant moved for summary judgment only on the FLSA collectives' claims for the Employee Appreciation Holiday Bonus. Dkt. No. 340 at 2. The plaintiffs moved for summary judgment on all their FLSA and state law bonus claims. Dkt. No. 380 at 2-3. The defendant conceded "that fact issues as to the Attendance Bonus and New Hire Bonus preclude summary judgment." Dkt. No. 341 at 2 n.1. But the defendant did not address the plaintiffs' arguments on the New Hire and Attendance Bonuses, so the court must determine whether it should grant the plaintiffs' summary judgment motion on those claims.

### A. <u>Background Facts</u>

Over the relevant periods, the defendant offered three bonuses to its employees: a New Hire Bonus, an Attendance Bonus and a Holiday Appreciation Bonus. Dkt. Nos. 347-10 at 212:4-13:21, 224:12-25:20, 349 at 28.

The defendant offered the New Hire Bonus from mid-November 2017 until April 1, 2023. Dkt. No. 387 at ¶130. Employees would receive the bonus in installments after reaching certain milestones in their employment. Dkt. No. 387 at ¶133; Dkt. No. 369. There were no criteria for the bonus other than continued employment, with the exception of the first two installments, which a "New Hire Sign On Bonus" agreement form from 2021 lists as depending also upon "good attendance." Dkt. No. 369. It is undisputed that the defendant excluded the New Hire Bonus from eligible employees' regular rate of pay when it calculated overtime compensation. Dkt. No. 387 at ¶135.

The defendant offered the Attendance Bonus from April 5, 2016 until October 1, 2019. Id. at ¶122. The bonus applied "for all schedule[d] shifts[.]" Dkt. No. 349 at 28. The defendant paid out the bonus quarterly. Id. at 29. The criteria for the bonus were not missing shifts and continued employment. Id. at 28-29; Dkt. No. 347-19 at 90:1-17. The defendant's handbook explained that "[t]he bonus will be calculated from date of an infraction and paid one month following the end of each payroll quarter to those employed at the end of each quarter." Dkt. No. 349 at 28. The defendant provided certain exceptions for covered absences and tardiness of less than one hour. Id. at 29. It is undisputed that the defendant excluded the Attendance Bonus from the eligible employee's regular rate of pay when it calculated overtime. Id. at ¶128.

The defendant offered the Holiday Appreciation Bonus starting in 2016 until at least 2022. Dkt. No. 367. The record contains flyers from 2016 to 2022. Id. at 1-7. The defendant placed a flyer explaining the Holiday Appreciation

Bonus in the breakroom of its locations. Dkt. No. 347-9 at 99:17-23. The flyer described the bonus as a "discretionary bonus to reward your outstanding work ethics." Dkt. No. 367 at 1-7. There were two, four-week bonus periods where the employee had to be absence-free and employed on the date of the payment. Id. The defendant allowed for a one-time schedule variance of no more than one hour and four "lates or late breaks (1-2 minutes max), or missed swipes in each qualifying period." Id.

The Holiday Appreciation Bonus itself was a percentage of wages earned "from worked hours only" over the two periods, varying from 8% to 20% over the years the defendant offered it. Id. The defendant noted with an asterisk that "a discretionary bonus is determined by management." Id. Another asterisk noted that the bonus "[d]oes not include paid time off such as vacation, personal holidays, PTO etc." Id. The defendant's executive vice president, Kristin Popp, stated in her deposition that the Holiday Appreciation Bonus included the regular and overtime wages the employee earned during the bonus period. Dkt. No. 347-9 at 96:12-23. But on the last flyer from 2022, there is a new asterisk and in-text note that the Holiday Appreciation Bonus is calculated "before Sunday, overtime, or other premium pay." Dkt. No. 367 at 7.

Jousha Hamill, a manager at one of the defendant's stores, stated that the bonus included both straight and overtime wages. Dkt. No. 347-7 at 61:3-10. He testified that it did not include holiday hours or other bonuses an employee may have earned during that period. Id. at 61:11-21.

In her deposition, Popp said that the Holiday Appreciation Bonus was discretionary, explaining that "[e]ven if an employee meets these qualifications listed, they still may not be eligible to receive the bonus based on other criteria." Dkt. No. 347-9 at 123:10-16. Later in her deposition she explained that a store manager may reduce an employee's bonus or decide to withhold it entirely based on factors like high attendance points, work safety write ups or disciplinary factors. Dkt. No. 347-10 at 226:25-227:13, 234:10-235:9. Popp also stated that the reason for the bonus was to encourage employees to work over the holidays, and she agreed that it was another type of attendance bonus. Id. at 225:11-16; Dkt. No. 347-9 at 95:24-96:7. She also agreed that the purpose of announcing the bonus was to make employees "aware that if they meet the criteria that they will get the bonus[.]" Dkt. No. 347-10 at 225:17-20.

Michael Malafa, the defendant's regional director, agreed in his deposition that the defendant had offered the Holiday Appreciation Bonus to encourage employees to work around the holidays. Dkt. No. 347-8 at 101:24-102:3.

B. Defendant's Bonus Argument

The defendant argues that only a non-discretionary bonus must be included in overtime. Id. It asserts that the Holiday Appreciation Bonus was discretionary and that the defendant appropriately excluded the bonus from its overtime calculations. Dkt. No. 341 at 22. The defendant states that under the FLSA, bonuses can be discretionary or non-discretionary, with courts considering the employer's control over whether to grant the bonus, the

amount of the bonus and the timing of the bonus to determine if it is discretionary. Id. The defendant maintains that a bonus is "non-discretionary only if it is paid according to a prior contract, agreement, or promise that creates a reasonable expectation for employees to receive such payments regularly." Id. The defendant argues that bonuses are discretionary when "both the fact that payment is to be made and the amount of the payment are determined at the sole discretion of the employer at or near the end of the period and not pursuant to any prior contract, agreement, or promise causing the employee to expect such payments regularly." Id. at 23 (quoting 29 U.S.C. §207(e)(3)). It says that it retained discretion as to both the bonus amount and whether it would be paid at all, with both based on subjective criteria. Dkt. No. 385 at 3.

The defendant argues that because a bonus has a baseline eligibility does not make it non-discretionary. Id. at 4. The defendant counters the plaintiffs' argument that "the intent or purpose behind issuing a bonus and the classification 'as a type of attendance bonus' is misplaced and not determinative of discretion" because "labels are not determinative." Id. The defendant claims that the plaintiffs incorrectly stated that "only the 'amount' of the bonus is discretionary." Id. The defendant maintains that "it is undisputed that whether or not to issue a bonus to an individual employee at all is within the managers' discretion." Id. The defendant argues that the infrequency with which employees received the Holiday Appreciation Bonus evinces its discretionary nature, noting that "44.6% of Woodman's employees never

received this bonus during the relevant period, and of the 55.4% of employees who did, 27.4% received it only once and 23.7% received it on only two occasions." Id. at 4.

The defendant also argues that a bonus that is "based off a percentage of income earned and incorporates overtime payment into the bonus amount determination need not be included in the regular rate for that bonus period." Dkt. No. 341 at 22 (citing 29 C.F.R. §778.210). It asserts that the plaintiffs' argument that a percentage bonus must take into account other bonuses is incorrect because the plaintiffs solely rely on a non-binding, unpublished case from the Northern District of California, Harris v. Best Buy Stores, L.P., Case No. 15-cv-00657, 2016 WL 4073327, at *5 (N.D. Cal. Aug. 1, 2026), that has been disavowed by the Department of Labor (DOL). Dkt. No. 385 at 5. The defendant argues that the Harris court misinterpreted a 2004 FLSA opinion letter because the DOL later issued an opinion in response to Harris, explaining that the court's interpretation was incorrect. Id. (quoting Opinion Letter Fair Labor Standards Act (FLSA), FLSA2019-7, 2019 WL 2914103, at *2 (July 1, 2019) ("An employer . . . is not required to retrospectively recalculate the regular rate if the employer pays a fixed percentage bonus that simultaneously pays overtime compensation due to the bonus[.]")).

C. The Plaintiffs' Bonus Arguments

The plaintiffs argue that non-discretionary bonuses must be included as part of an employees' "regular rate" for overtime purposes, unless an exclusion applies. Dkt. No. 380 at 14. They contend that the defendant's Attendance,

New Hire and Holiday Appreciation Bonuses all were non-discretionary and no exclusion applies, so they should have been included in overtime. Id. The plaintiffs argue that the bonuses were meant to motivate good attendance and adherence to the defendant's work-safety requirements. The plaintiffs also maintain that the bonuses were non-discretionary because the defendant announced the formula or amount of the bonuses in advance of payment and continued employment was a requirement for the bonuses. Id. at 15.

The plaintiffs maintain that the defendant had two options to comply with the relevant regulations. Id.

> (1) [I]t can apportion the bonus back over the workweeks of the representative period during which the bonus was earned, and provide additional compensation to the employee for each workweek that he or she worked overtime during the representative period equal to one-half of the hourly rate of pay allocable to the bonus for that week multiplied by the number of statutory overtime hours worked during the week, 29 C.F.R. § 778.209(a); or (2) it can adopt some other reasonable and equitable method of allocation, such as assuming that the employee earned an equal amount each workweek during the representative period to which the payment applies, such that overtime pay may be computed in an amount equal to one-half of the average hourly increase in pay resulting from payment allocated to the workweek, multiplied by the number of statutory overtime hours worked in that workweek. 29 C.F.R. § 778.209(b).

Id. at 15-16. The plaintiffs contend that the defendant did neither with respect to the bonuses. Id.

The plaintiffs first argue that the defendant did not, and cannot, carry its burden of proving that the Holiday Appreciation Bonus was discretionary. Dkt. No. 382 at 4. They assert that non-discretionary bonuses must be included in overtime and that for a bonus to be non-discretionary, the employer must

retain control over the fact of the payment and over the amount of the payment. Id. at 4. The plaintiffs argue that if an employer promises a bonus in advance, the bonus is non-discretionary under the applicable DOL regulations. Id. at 5.

The plaintiffs say that the Holiday Appreciation Bonus was meant to induce good attendance near the holidays and was non-discretionary. Id. at 5-6. They state that the defendant announced the criteria for the bonus by putting a flyer in the breakroom of each of its stores. Id. at 5. The plaintiff emphasizes that the defendant's executive vice president, Kristin Popp, stated in her deposition that this was to make employees "aware that **if they meet the criteria that they will get a bonus**." Id. at 5 (emphasis in original). The plaintiffs argue that the purpose of the bonus was "'to reward good attendance during a specified period of time,' typically the eight-week period centered around the holidays" and was "another type of attendance bonus." Id.

The plaintiffs concede that the amount of the bonus may be discretionary but argue that that does not change its non-discretionary nature. Id. The plaintiffs state that the defendant's payroll department is required to take internal factors into consideration when administering the Holiday Appreciation Bonus. Id. at 6. They state that the payroll department makes a recommendation that the managers reduce each employee's bonus amount "commensurate with the number of policy infractions" they accumulated throughout the year. Id. The plaintiffs explain that the manager can overrule the payroll department's recommendation, "in whole or in part, if the Store

Manager is aware of certain exigencies which may mitigate the Store Employee's attendance or work-safety infractions." Id. The plaintiffs argue that because all employees who received the bonus met the defendant's baseline criteria, the bonus must be non-discretionary, because "*eligibility* for each bonus is determined based on a known criteria and/or formulae established by Defendant and announced to Store Employees to induce their good attendance near to the holidays." Id.

The plaintiffs also contend that the Holiday Appreciation Bonus is not an excludable percentage bonus. Id. They state that an employer is permitted to exclude a bonus from overtime calculations when the bonus is the same percentage of the employee's regular wages or "straight-time earnings" and overtime wages. Id. at 7. The plaintiffs argue that the defendant did not include the Attendance Bonus or the New Hire Bonus in its overtime calculations, meaning that "the formula for calculating the Employee Appreciation Holiday Bonus necessarily failed to compensate 'straight-time earnings' and 'overtime earnings' in equivalent percentages in violation of 29 C.F.R. § 778.21." Id. at 7.

The plaintiffs also argue that "should this Court determine that Defendant failed to compensate Store Employees overtime premium compensation for all hours worked and/or work performed, including overtime hours worked as a result of Plaintiffs' remaining other claims, then it necessarily and further follows that Store Employees' 'straight-time earnings' and 'overtime earnings' will not have been paid in equivalent percentages

because Defendant failed to compensate all hours worked in excess of 40 in the first instance." Id. at 8.

In a conclusory footnote, the plaintiffs argue that "[b]ecause the WWPCL and IMWL interpret the phrase 'regular rate' consistently with the FLSA, Defendant's liability as to Plaintiffs and the *Wyngaard, Hunter, and Robertson* Collectives under the FLSA conclusively establishes Defendant's liability to the Wisconsin and Illinois Nondiscretionary Compensation Subclasses. Dkt. No. 380 at 14 n.7.

D. The Court's Analysis

1. *The FLSA Bonus Claims*

Under the FLSA, an employer must compensate an employee "at a rate not less than one and one-half times the regular rate at which he is employed" for the amount of time the employee worked in excess of forty hours in a workweek. 29 U.S.C. §207(a)(1). An employee's "regular rate" is "all remuneration for employment paid to . . . the employee." Id. at §207(e). There are eight excepted kinds of remunerations that do not need to be included in the employee's regular rate. Id. at §207(e)(1)-(8).

Discretionary bonuses are one of these excepted remunerations. Id. at §207(e)(3)(a). A bonus is discretionary when "both the fact that payment is to be made and the amount of the payment are determined at the sole discretion of the employer at or near the end of the period and not pursuant to any prior contract, agreement, or promise causing the employee to expect such payments regularly[.]" Id.

Non-discretionary bonuses, on the other hand, must be included in an employee's regular rate of pay. Id. at §207(e)(3). The purpose of this rule is to preclude employers from underpaying their employees. "Otherwise, an unscrupulous employer could take a portion of an employee's ordinary compensation, call it a 'bonus,' exclude it from the employee's regular rate, and thereby artificially deflate the employee's overtime rate of pay." Weninger v. Gen. Mills Operations LLC, 344 F. Supp. 3d 1005, 1009 (E.D. Wis. 2018).

The label an employer gives to a bonus is not determinative; the terms of the statute and the facts of the case determine whether a bonus is discretionary or not. 29 C.F.R. §778.211. The DOL regulations—which have the "force and effect of law," Batterton v. Francis, 432 U.S. 416, 425 n.9 (1977)—explain that

> [b]onuses which are announced to employees to induce them to work more steadily or more rapidly or more efficiently or to remain with the firm are regarded as part of the regular rate of pay. Most attendance bonuses, individual or group production bonuses, bonuses for quality and accuracy of work, bonuses contingent upon the employee's continuing in employment until the time the payment is to be made and the like are in this category[.]

29 C.F.R. §778.211.

There is no material dispute that the Attendance and New Hire Bonuses were non-discretionary bonuses that should have been included in the defendant employees' regular rate of pay. The defendant, who has the burden of proving that these bonuses should not have been included, Herman, 11 F. Supp. 2d at 1042, did not address the plaintiffs' arguments on these claims. The record also shows that the defendant did not retain any discretion with

these two bonuses. So the court will grant the plaintiffs' motion for summary judgment as to the FLSA Attendance and New Hire Bonuses claims.

Regarding the Holiday Appreciation Bonus, it is undisputed that this bonus was not included in the employees' regular rate. For purposes of determining whether the defendant violated the FLSA as a matter of law as to the Holiday Appreciation Bonus, the court must determine whether this bonus was discretionary or non-discretionary.

Labels are not determinative. Although the defendant's flyers state that the Holiday Appreciation Bonus is discretionary, the terms of the statute, the regulations and the facts show that the bonus is non-discretionary. The defendant bases most of its argument on the fact that it retained discretion as to the payment of the bonus, the amount of payment and the timing of the payment. Although the defendant *did* retain discretion on these issues, but it has failed to meet the final requirement that the bonus not be a promise as interpreted by the regulations.

The examples of discretionary bonuses provided in the DOL regulations are illustrative: "[e]xamples of bonuses that may be discretionary include bonuses to employees who made unique or extraordinary efforts which are not awarded according to pre-established criteria, severance bonuses, referral bonuses for employees not primarily engaged in recruiting activities, bonuses for overcoming challenging or stressful situations, employee-of-the-month bonuses[.]" 29 C.F.R. §778.211(d). According to the regulations, discretionary bonuses do not have the kind of announcement and pre-established criteria

that are present in the Holiday Appreciation Bonus. These examples and the rest of the regulations illustrate that discretionary bonuses are backward-looking. On the other hand, forward-looking bonuses, intended to induce attendance or more efficient work, are non-discretionary.

The Holiday Appreciation Bonus meets the first three criteria for a discretionary bonus: the defendant retained control over the fact of payment, the amount of payment and the time of payment at or near the end of the period. But, as illustrated by the applicable DOL regulations, the bonus was made under a prior promise and so was non-discretionary.

The DOL regulations state that "[b]onuses which are announced to employees to induce them to work more steadily or more rapidly or more efficiently or to remain with the firm are regarded as part of the regular rate of pay." 29 C.F.R. §778.211(c).

The undisputed facts show that the defendant offered the Holiday Appreciation Bonus to induce its employees to work during the holidays. Dkt. No. 347-8 at 101:24-102:3, Dkt. No. 347-10 at 225:11-16, 367. In addition to the testimony from the defendant's executives directly confirming this fact, all the flyers announcing the bonus state that the bonus is to "reward your outstanding work ethics." Dkt. No. 367 at 1-7. In 2019 and 2020 the flyers stated, "Enjoy this great bonus, which equates to over a million dollars in your pocket for good attendance, which makes for great customer relations." Id. at 4-5. In 2020 and 2021 the flyers stated, "Enjoy this great bonus, which equates to over $2 million in your pocket for working all those extra hours,

which makes for great customer relations." Id. at 6-7.[3] This language was meant to induce the defendant's employees to work more steadily and efficiently over the holidays, making this a non-discretionary bonus under §778.211(c).

The DOL regulations also state that "[m]ost attendance bonuses . . . [and] bonuses contingent upon the employee's continuing in employment until the time the payment is to be made and the like are in this category [of being included in the employee's regular rate]." §778.211(c). Popp, one of the defendant's executives, agreed that the Holiday Appreciation Bonus "was another type of attendance bonus." Dkt. No. 347-9 at 95:24-96:7. And the defendant's employees were required to still be employed with the defendant when the Holiday Appreciation Bonus was paid. This requirement induced the employees to remain with the defendant so that they would be eligible to receive the bonus.

The defendant also argued that the Holiday Appreciation Bonus was a percentage bonus. While not technically an exception, employers do not have to include in employees' overtime calculations non-discretionary bonuses which are a percentage of the employee's normal wages and overtime wages because the bonus pays the straight and overtime wages at the same time. 29 C.F.R. §778.210. This is because, mathematically, such a percentage bonus achieves the same impact as including the bonus in the employee's regular rate for overtime calculation. Weninger, 344 F. Supp. 3d at 1009. Employers have the

[3] The bonus amount stated in the 2022 flyer was "$2.5 million."

burden of proving "that certain payments it has made should not be included in determining its employees' 'regular rate.'" Herman v. Anderson Floor Co., Inc., 11 F. Supp. 2d 1038, 1042 (E.D. Wis. 1998) (citing Idaho Sheet Metal Works, Inc. v. Wirtz, 383 U.S. 190, 209 (1966)).

Several of the defendant's executives stated in their depositions that the defendant used the employees' straight and overtime wages to calculate the Holiday Appreciation Bonus. Dkt. Nos. 347-7 at 61:3-10, 347-9 at 96:12-23. This would not violate the FLSA even though the non-discretionary bonus (cush as the Holiday Appreciation Bonus) was not included in the regular rate, because mathematically, such a percentage bonus achieves the same impact as including the bonus in the employee's regular rate for overtime calculation. 29 C.F.R. §778.210; Weninger, 344 F. Supp. 3d at 1009. The plaintiffs even seem to agree that the defendant used their straight and overtime wages to calculate the bonus.

The plaintiffs' argument, based on the reasoning in Harris—that the defendant needed to include the other non-discretionary earnings in the Holiday Appreciation Bonus's calculations—was rejected by the DOL in its opinion letter. See Opinion Letter FLSA2019-7, 2019 WL 2914103, at *2 n.3. In that letter, the DOL specifically stated that a percentage bonus is compliant even though it "is not a percentage of all remunerations for employment[.]" Id. at *2 n.3 (internal quotations omitted). The letter expressly rejects the conclusion of the Harris court: "[f]or this reason, WHD disagrees with courts that have interpreted §778.210 to require an employer to multiply an

employee's total earnings by the same percentage to satisfy FLSA's overtime compensation requirements." Id. (citing Harris, 2016 WL 4073327, at *5).

The record here shows that the defendant did *not* include the employees' overtime wages for all the relevant periods at issue. In 2022, the defendant's flyer advertising the bonus changed slightly from the year before. From 2016 to 2021, the flyer stated that the Holiday Appreciation Bonus was a percentage of "wages earned (from hours worked only)." Dkt. No. 367 at 1-6. In 2022, the flyer stated in a footnote that the bonus was a percentage of wages earned (from hours worked only) "before Sunday, overtime, or other premium pay." Id. at 7. This addition indicates that the bonus would not include overtime pay, which would mean it no longer complied with 29 C.F.R. §778.210. Joshua Hamill, a store manager, also stated in his deposition that the defendant did not include holiday hours and paid time off when calculating the bonus. Dkt. No. 347-7 at 61:11-14.

There is disputed evidence as to whether the defendant *did* include overtime in the Holiday Appreciation Bonus calculations in 2022. Sunday pay, holiday hours, paid time off and premium pay are not included in employees' regular rate for bonus purposes. See 29 U.S.C. §207(e)(2), (6). But overtime pay must be included. See 29 C.F.R. §778.210. Based on the 2022 flyer, the record appears to show that, at least in 2022, the Holiday Appreciation Bonus did not include the employees' overtime pay.

Two of the defendant's representatives gave depositions after the 2022 Holiday Appreciation Bonus and talked about the bonus calculations. Michael

Malafa, a regional director, stated that the bonus was "calculated by a percentage of employees' wages earned between a period of time." Dkt. No. 347-8 at 101:21-23. He did not specify that this included overtime. Clint Woodman, the defendant's president, stated the same thing but did not specify that it included overtime. Dkt. No. 347-11 at 635-8. Popp and Hamill both stated in their 2020 depositions that the bonus included overtime. Dkt Nos. 347-7 at 61:3-10, 347-9 at 96:12-23.

This evidence creates a genuine dispute of material fact as to whether the defendant included employees' overtime wages in the 2022 Holiday Appreciation Bonus. This is relevant to the Robertson plaintiffs' FLSA Non-Discretionary Compensation Collective's claims, which cover Illinois employees who received the Holiday Appreciation Bonus from December 13, 2021 until judgment. Dkt. No. 249 at 17. Other than the bonuses paid after December 13, 2021, the record shows that the Holiday Appreciation Bonuses paid between 2017 and 2021 complied with 29 C.F.R. §778.210 and did not need to be included in the employees' regular rate. The defendant's representatives all confirmed that the defendant included overtime in the pay calculations, and, aside from 2022, the flyers support this conclusion.

2. *The Wisconsin and Illinois Law Bonus Claims*

Only the plaintiffs moved for summary judgment for the bonus claims under state law. Dkt. No. 380 at 2-3. The plaintiffs maintain that Wisconsin and Illinois law both track the FLSA's definition of regular rate and so the court's conclusion about the FLSA also should apply to the Wisconsin and

Illinois claims. The plaintiffs cite Kuhnert v. Advanced Laser Machining, Inc., 331 Wis. 2d 625 (Wis. Ct. App. 2011) and 56 Ill. Admin. Code §§210.120, 210.410-430 in support of their argument. The defendant did not address the plaintiffs' state law bonus claims, other than to argue that the plaintiffs had not shown that Wisconsin and Illinois interpret regular rate in the same way as the FLSA. See Dkt. No. 388 at 5.

Kuhnert does not support the plaintiffs' contention. But in Lutz v. Froedtert Health Inc., Case No. 23-CV-974, 2025 WL 2049206 (E.D. Wis. July 22, 2025), amended on reconsideration in part, 2025 WL 2804431 (E.D. Wis. Oct. 2, 2025), Judge William E. Duffin of this district found that Wis. Admin. Code §DWD 274.03—the provision that defines overtime as time-and-a-half of an employee's regular rate—uses the term "regular rate" as it is used in 29 U.S.C. §207(e); Judge Duffin concluded that federal law should be used as persuasive authority. On this basis, Judge Duffin adjudicated the Wisconsin law claims at the summary judgment stage. Id.

Section 210.120 of the Illinois Administrative Code, Title 56, states that "for guidance in the interpretation of the Act and this Part, the Director may refer to the Regulations and Interpretations of the Administrator, Wage and Hour Division, U.S. Department of Labor, administering the Fair Labor Standards Act of 1938, as amended (29 U.S.C. 201 et seq.)." In Illinois, employers calculate overtime by multiplying an employee's regular rate by one-half. See id. at §210.430(a). Section 210.410 explains how "regular rate" is calculated under Illinois law and provides that "'regular rate' shall be deemed

to include all remuneration for employment paid to . . . the employee[.]" The provision does not mention bonuses by name, but it states that "sums paid in recognition of services performed which are . . . determined at the sole discretion of the employer" are not included in the employee's regular rate. Id. at §210.410(c)(1). The Illinois Supreme Court has looked to federal law for persuasive authority when interpreting these provisions. Mercado v. S&C Electric Co., 267 N.E.3d 891, 902 (Ill. 2025).

Because Wisconsin and Illinois courts both look to federal law to define "regular rate" and because the defendant has offered no contradictory authority, the court will grant the plaintiffs' summary judgment motion as it relates to their state law non-discretionary compensation claims for the Attendance and New Hire Bonuses. Accepting the plaintiffs' argument that Wisconsin and Illinois interpret regular rate in the same way as the FLSA means denying in part their motion for summary judgment as to the Holiday Appreciation Bonus because the bonus would be an excludable percentage bonus.

3. *Summary of the Court's Bonus Claim Analysis*

The court will grant the plaintiffs' motion for partial summary judgment regarding the FLSA Collective claims, the WWPCL Non-Discretionary Compensation Subclass claims and the IMWL Non-Discretionary Compensation Subclass claims that relate to the Attendance Bonus and New Hire Bonus and will deny the defendant's motion on those same claims. The court will grant in part the defendant's motion for summary judgment as to

FLSA Collective claims, the WWPCL Non-Discretionary Compensation Subclass claims and the IMWL Non-Discretionary Compensation Subclass claims that relate to the Holiday Appreciation Bonus for the 2017-2021 period and deny the plaintiffs' motion on those same claims. The court will deny the plaintiffs' and defendant's motions for summary judgment as to the FLSA Collective claims, the WWPCL Non-Discretionary Compensation Subclass claims and the IMWL Non-Discretionary Compensation Subclass claims that relate to the Holiday Appreciation Bonus for the period following December 13, 2021.

## V. The FLSA and State Law Meal Period and Time-shaving Claims

### A. Walking Time

The time the defendant's employees spent walking to and from the time clock is key to several of the plaintiffs' claims. It informs the plaintiffs' time-shaving claims, their meal period claims and the defendant's *de minimis* defense. The court will address this issue first.

#### 1. *Background Facts*

The facts for this section pertain to what the defendant required of its employees while they walked through the defendant's stores. Once employees clocked in at the time clock in the breakroom, they were required to immediately go to their work area. Dkt. No. 387 at ¶111. Each of the employees had to walk to their work area from the time clock. Dkt. Nos. 383 at ¶34, 387 at ¶113. The employees had to make the walk several times a shift. Dkt. Nos. 383 at ¶30, 387 at ¶111. First, the employees had to walk to their work area after initially clocking in. Id. Then they had to walk from their work area to

clock out for their meal break and when coming back from the meal break. Id. Finally, they walked from their work area once more to clock out at the end of their shift. Id.

The parties dispute how long these walks took. The defendant asserts that these walks ranged from two to seven minutes. Dkt. No. 383 at ¶34. The plaintiffs assert that these walks ranged from one to two minutes. Dkt. No. 387 at ¶113. Mary Hunter, a stocker at one of the defendant's stores, stated that her walks varied between less than a minute and four minutes, depending on which department she was stocking. Dkt. No. 341-8 at 52:16-53:20. Jaclyn Beegun, a checker, agreed that she had a five-to-seven-minute walk to her work area. Dkt. No. 341-11 at 23:17-25:22. Jesse Wyngaard stated that his walk was one to two minutes. Dkt. No. 341-7 at 45:12-18, 60:17-21. Ray Barnes, a stocker, stated that his walks were about two to five minutes. Dkt. No. 341-10 at 26:4-6, 30:15-20, 53:5-11. Terry Roberrtson, another stocker, stated that his walks were one to two minutes. Dkt. No. 341-9 at 38:15-39:10, 40:2-41:22. In response to the defendant's interrogatory—"[h]ow long does it take you to walk from the time clock to your work station?"—the opt-in plaintiffs responded that their "best estimate would be a one (1) to two (2) minute walk."[4] Dkt. No. 347-18 at 2. Based on these employees' statements, it appears that the walk varied from less than one minute to seven minutes.

[4] The plaintiffs' interrogatory response includes sworn verification pages from each opt-in plaintiff. See Dkt. No. 347-18 at 4-74, 78, 82, 85, 89-114.

The employees encountered customers during these walks and helped them find items in the store, greeted them and offered them some kind of customer service.[5] Dkt. Nos. 383 at ¶¶30, 37, 387 at ¶¶116-118. The plaintiffs assert that these interactions occurred frequently. Dkt. No. 387 at ¶118. The defendant disputes this assertion for lack of foundation and states that the interactions are rare, but admits that "[a]ccording to Plaintiffs, such brief interruptions happen approximately once or twice a shift or even as infrequently as every other shift, once a week, or 5-6 times total throughout their employment." Dkt. Nos. 383 at ¶¶ 37-38, 387 at ¶118.

Barnes, who worked overnight, stated that he rarely was stopped by customers. Dkt. No. 347-1 at 30:15-20. Beegun stated that she would help customers occasionally on her walks. Dkt. No. 347-2 at 26:10-20, 31:16-32:1. Hunter stated that customers stopped her frequently during her walks, often multiple times a shift. Dkt. No. 347-3 at 62:15-64:9. Robertson stated that he had been stopped on his walks, but he was not clear on how often. Dkt. No. 347-2 at 42:9-44:2. Robertson did, however, state that helping a customer on a walk once a night was normal. Id. at 44:3-45:3. Wyngaard stated that he helped customers on his walks "lots of times" and that he would have interactions with customers the instant he left the breakroom. Dkt. No. 347-5 at 28:23-29:15, 61:5-7.

[5] Although the parties dispute or deny some of the other's proposed findings of facts on this issue, both assert that the employees, at least some point, helped customers while walking to and from the time clock.

Joshua Hamill, a manager at one of the defendant's stores, testified at his deposition that part of his job as manager is to ensure that store employees are "taking care of the customers." Dkt. No. 347-7 at 15:6-9. Michael Malafa, the defendant's regional director, admitted that new employees are trained to take a customer to where an item is located rather than pointing them in the general direction of the item. Dkt. No. 347-8 at 79:6-13.

The defendant's hiring and training materials emphasize exceptional customer service. The defendant's hiring fliers for checkers, baggers and stockers include providing great customer service as a job duty.[6] Dkt. No. 353 at 1-2. Stockers had the duty to "[a]ssist customers reach and/or locate products[.]" Id. at 2. The third slide of the defendant's orientation presentation states the defendant's mission statement with its three parts: "to provide merchandise at a low cost," "to provide services in a customer friendly atmosphere" and "to provide a wide variety of merchandise." Dkt. No. 358 at 4.

Out of the forty-four slides in the orientation presentation, six are dedicated to customer service training—the most out of any topic. See generally id. The defendant trained its employees that customer service is one of the first necessities of a retail business and that it is the "lifeblood" of any store. Id. at 39. The defendant's "employees [were] asked to provide exceptional service to [the] customers." Id. The defendant trained its employees to show customers "a nice warm, sincere smile and greet them with 'Good Morning', 'Good Afternoon',

---

[6] The facts are undisputed unless otherwise noted.

or ‘Good Evening’ and say ‘Thank You’ and ‘Have a nice day’[]” anytime employees came in eye contract with a customer. Id.

There is a slide entitled “Always Remember,” which lists the things employees are to remember. Id. at 40. They are: “In your contacts with customers, YOU REPRESENT OUR STORE[,]” “Our reputation with the customer is at stake, IT IS IN YOUR HANDS[,]” “Your action and attitude towards customers can bring the customer back again and again, or it can quickly turn customers away[]” and “You have everything to gain by being courteous and taking the customer to where an item is rather than just sending them or pointing them in the general direction.” Id. The next slide says that employees should “[a]lways be crisp; customers appreciate prompt, attentive service.” Id. at 41. Another slide told employees that a customer “is not an interruption of our work – they are the purpose of it.” Id. at 43.

The defendant instructed its employees, “[o]nce you have punched in, you are ‘on the clock’ working. This means you are to report to your supervisor or your work area immediately after you have punched.” Id. at 14. The orientation slides instruct the employees that “[w]hen punching in for the beginning of your shift, you **MUST** punch in *at least* one minute before the start time listed on your schedule. This allows you to be at your work area at the starting time of your shift.” Id. (emphasis in original).

The defendant administered quizzes to new employees that tested them on the defendant’s policies, including customer service and punch clock rules.

Dkt. No. 359.[7] The first true/false question is, "Part of Woodman's mission statement is to provide services in a customer friendly atmosphere[;]" the correct answer is "true." Id. at 1. The employees were asked, "Who is the most important person in our business?;" the correct answer is "customer." Id. at 3. The employees were asked, "What are the three most important statements we need to say to each and every customer?;" the correct answer is "hello," "thank you" and "have a nice day." Id. The employees were asked, "If a customer asks where a product is located, what action should be taken to fulfill their request?;" the correct answer is "show or take the customer to where the product is located." Id.

The first page of the defendant's "Personnel Policies and Guidelines"[8] lists several "simple rules" that the defendant's president wishes every employee to follow. Dkt. No. 349 at 2. The first and last of these rules are geared toward customer service: "Smile, say 'Thank You' and 'Have a Nice Day'" and "Say 'Hello', 'Thank You', 'Have a Great Day', and SMILE". Id.

The first sentence of "Section 2: Dress Code" is "Name badges worn by employees help create a friendlier and more personal store atmosphere." Id. at 5. The actual rule, in parentheses, "(Your name badge should be displayed on

---

[7] Dkt. No. 359 is a quiz with the correct answers filled in.

[8] The plaintiffs offered several versions of the defendant's personnel policies and guidelines, versions from different years and different stores. These total over 700 pages. See Dkt. No. 350. Neither party addressed any differences among the versions. The plaintiffs reference a version from 2018 for seven stores in Wisconsin. Dkt. No. 349. The court pulled relevant portions from that version and assumes that it is representative of the others.

your uniform at all times)" is subordinated to the customer service plug. Id. The first item under "Section 6: Attendance" is "Good attendance is very important to provide exceptional customer service." Id. at 13. The handbook explains that employee "[b]reaks are given at a time when they least interfere with the smooth operation of the store or service to the customer." Id. at 4. The employees' schedules are created and maintained to best "serve the customers' needs." Id. at 7.

Under the defendant's "Rules for General and Safety Conduct," "discourteous treatment of customers" is a group #2 violation, which results "in a work and safety report being sent or given to [the employee]." Id. at 21. More than five group #2 violations in a twelve-month period result in demotion or termination. Id. at 20.

The defendant's handbook does not state that the employees are off the clock when they are walking to and from the breakroom; neither do its training materials. Malafa, a regional director, confirmed as much in his deposition. See Dkt. No. 347-8 at 66:15-68:4, 79:6-11. Clint Woodman, the defendant's president, testified that "some do and some don't" when asked if an employee walking to the break room to punch out was allowed to tell a customer they encountered, "I'm on break, I can't help you right now." Dkt. No. 347-11 at 51:1-6. Woodman sent a quarterly letter to the employees updating them on the state of the business. Dkt. No. 370. In each letter in the record, Woodman reminded his employees of the "remarkable simple rules" from the first page of the handbook, bookended by the rules "Smile, say 'Thank You' and 'Have a

Nice Day'" and "Say 'Hello' and 'Thank You,' and SMILE." Dkt. No. 370 at 3, 5, 8, 10, 12, 14, 18, 21, 24, 26, 28, 31, 35. In these letters Woodman also reminded the employees that these customer interactions, these "hellos," "thank yous," and "can I help yous," are important to the business. Id.

Kristin Popp, an executive for the defendant, stated in her deposition that the defendant asked its employees to smile and say hello to customers they encountered when walking to the time clock. Dkt. No. 371-10 at 108:15-19. She stated that the time spent walking to and from the breakroom was part of the employee's break. Id. at 118:25-119:6.

Sarah Bin, the defendant's training and development coordinator, stated that ignoring a customer is an example of discourteous treatment and that the defendant trained its employees that it is best practice to take customers to an item should they ask where it is. Dkt. No. 347-6 at 116:3-25. She also said that "once [an employee has] punched in [they] were on the clock working[.]" Id. at 147:11-13. She stated that it is a discipline violation if the employee did not immediately start working after clocking in. Id. at 128:13-19.

2. *The Defendant's Walking Time Arguments*

The defendant argues that the employees were not working and were without any duties when they were walking to and from the breakroom. The defendant asserts that its employees' meal periods started when they began walking to the break room, not when they clocked out. Dkt. No. 341 at 11-16.

The defendant cites the Portal-to-Portal Act, 29 U.S.C. §254(a), arguing that it "explicitly exempts from the minimum wage and overtime provisions of

the FLSA '*walking*, riding, or traveling *to and from the actual place of performance of the principal activity* or activities which such employee is employed to perform." Id. (citing 29 U.S.C. §254(a)) (emphasis in original). The defendant claims that the Seventh Circuit and the United States Supreme Court have agreed with its argument "that paying for walking time would undermine the distinctions drawn between 'principal activity' and 'preliminary' and 'postliminary' activities." Id. at 13-14.

The defendant claims that it assigned each of its employees a workstation, which is the "actual place of performance of [their] principal activity." Id. The defendant asserts that "[t]ime spent walking to workstations is not compensable—compensable time only begins once employees have reached their workstation." Id.

The defendant compares this case to IBP, Inc. v. Alvarez, 546 U.S. 21 (2005). Id. at 14. It argues that an employee walking to his or her workstation is "two steps removed" from the actual job and not compensable, like the time the plaintiffs in Alvarez spent waiting to put on protective gear. Id. (citing Alvarez, 546 U.S. at 42). The defendant maintains that walking to a workstation is not integral to its employees' principal activities and claims in a parenthetical that the Supreme Court observed "that defining 'integral and indispensable' solely by necessity would lead to the 'logical (but untenable) conclusion' that walking time is always a 'principal activity[.]'" Id. (citing Alvarez, 546 U.S. at 40).

The defendant argues that employees' "walking time was largely duty free," claiming that they were not required to carry anything or to do any other tasks. Id. The defendant admits that the plaintiffs may have had to answer a customer question, but assert that "this happened at most once a day to as seldomly as five times during their entire time at Woodman's." Id. The defendant argues that any purported interruption is *de minimis*. Id.

While admitting that it "prides itself on strong customer service and encourages its employees to be friendly to customers they interact with at a [defendant's] store[,]" the defendant argues that these customer service interactions during the employees' walk to and from the time clock are minimal and not principal activities. Dkt. No. 385 at 7-8. The defendant claims that "[f]ar more substantial preliminary and postliminary tasks than smiling, and activities that occur on a much more frequent or even daily basis, have been deemed not to be principal activities." Id. at 8 (citing Bleichner v. Spies Painting & Decorating, Inc., Case No. 08-CV-057, 2009 WL 281145, at *1-2 (W.D. Wis. Feb. 4, 2009); Dekeyser v. Thyssenkrupp Waupaca, Inc., Case No. 08-C-0488, 2024 WL 6682446, at *4-5 (E.D. Wis. Nov. 25, 2014)).

The defendant argues that its employees' principal places of performance are only their workstation, even if they may have duties away from it. Id. at 8-9. The defendant offers numerous "see" signal citations to case law with parenthetical quotations to support this argument: "In re: Amazon.com, Inc. Fulfillment Ctr. Fair Lab. Standards Act (FLSA) & Wage & Hour Litig., 905 F.3d 387 (6th Cir. 2018) (warehouse); Perez v. Mountaire Farms, Inc., 650 F.3d 350

(4th Cir. 2011) (meat processing); Mitchell v. Se. Carbon Paper Co., 228 F.2d 934, 936 (5th Cir. 1955) (manufacturing facility)." Id. at 8. The defendant argues, "[a] principal place of performance need not be the only location any arguably related job activity may occur." Id. at 9.

The defendant counters the plaintiffs' "engaged to wait" argument, stating that the walking time is "simply" not "waiting" time. Id. at 9-10. The defendant claims that "[t]his Court has rejected similar arguments attempting to conflate these legal arguments." Id. at 9. It cites Sanford v. Preferred Staffing Inc., 447 F. Supp. 3d 752, 756 (E.D. Wis. 2020) (Stadtmueller, J.), claiming that the court rejected the argument that "travel time and time spent waiting for bus to travel to work was waiting time, an area of the law typically for 'firefighters and employees who work on-call shifts,' as 'this argument is a thinly veiled recasting of Plaintiffs' other arguments regarding what should be considered integral to their principal work activity.'" Id. at 10

3. *The Plaintiffs' Walking Time Arguments*

The plaintiffs argue that the employees were working while walking. Dkt. No. 382 at 9. They argue that employees are "on the clock working" once they clock in and remain working until they clock out. Id. at 23.

The plaintiff states that the Supreme Court has recognized that the actual place of performance is case specific, noting that in Alvarez, the Court found that "the locker room where employees donned and doffed required clothing constituted the 'actual place of performance.'" Id. at 10-11 (citing Alvarez, 546 U.S. at 23).

The plaintiffs counter the defendant's argument that employees' actual places of performance were limited to "stocking shelves, checking out groceries, or moving items in the warehouse." Id. at 11. They contend that this argument is simplistic and "ignores the actual nature of the work Defendant hires and requires its Store Employees to perform." Id. The plaintiffs point out that many of the cases analyzing "actual place of performance" involve jobs with a specific work bench or station on an assembly line. Id. (collecting cases). They assert that these cases deal with jobs dissimilar to the ones at here. Id. The plaintiffs state that "[a]fter a diligent and thorough review, Plaintiffs are unaware of any case analyzing 'actual place of performance' involving brick-and-mortar retail stores like Defendant's Stores." Id. at 11 n.6.

The plaintiffs argue that the defendant has made exceptional customer service part of its employees' principal activities and they maintain that the actual place of performance for this principal activity was any area in the defendant's store where an employee may encounter a customer. Id. at 11-12. The plaintiffs emphasize that the defendant's orientation presentation told employees that they represent the defendant when they interact with customers and that "employees are asked to provide exceptional service to our customers." Dkt. No. 382 at 12 (citing Dkt. No. 363 at 39-40). The plaintiffs claim that the employees were trained that a "**customer is not an interruption of work** - they are the purpose of it." Id. (citing Dkt. No. 381 at ¶114) (emphasis in original). The plaintiffs maintain that any time the employees "c[a]me into eye contact with a customer," the defendant "expect[ed]

them to show a 'nice warm, sincere smile' and 'greet them with 'Good Morning', 'Good Afternoon', or 'Good Evening' and say 'Thank you' and 'Have a nice day''." Id. (citing Dkt. No. 381 at ¶¶26, 116). The plaintiffs emphasize that "[i]f [the employees] fail to do so or otherwise discharge their customer service duties, they are subject to discipline for 'discourteous treatment of customers.'" Id. (citing Dkt. No. 381 at ¶¶28, 117).

The plaintiffs also assert that "[i]t is Defendant's expectation and requirement that Store Employees be on Defendant's premises and clocked-in at least one minute prior to their scheduled shift start time." Id. at 14 (citing Dkt. No. 381 at ¶84). The plaintiffs state that it is the defendant's policy that "[o]nce a Store Employee clocks-in they are 'on the clock working' . . . and remain working until such time that they clock out[.]" Id. (citing Dkt. No. 381 at ¶¶56, 83-84, 86). The plaintiffs note that to make it easier for customers to recognize employees and to make customers more at ease, the defendant requires employees to wear clothes with the defendant's logo. Id. (citing Dkt. No. 358). The plaintiffs claim that the defendant, "to ensure that Store Employees are not distracted from their duties and are available to customers,[] prohibits even the possession of 'mobile/cellular phones or pagers . . . on company time,' and Store Employees are subject to discipline for even having a cellphone in their possession once they clock-in." Id. (citing Dkt. Nos. 349, 350, 358).

The plaintiffs argue that although employees may not always be assisting a customer, they are "engaged to wait" regarding their customer service duties.

Id. at 13. The plaintiffs argue that because the defendant required its employees to be ready to serve a customer, regardless whether they actually serve one, when they are walking through the store, the walking time is compensable. Id. (citing Armour & Co. v. Wantock, 323 U.S. 126, 133 (1944) and 29 C.F.R. §790.7(h)). The plaintiffs contend that these requirements mean that once employees step out of the breakroom onto the floor after clocking in, they are responsible for performing their customer services duties. Id. at 12. The plaintiffs argue that employees are not relieved of these duties until they are back in the breakroom. Id. The plaintiffs conclude by arguing that customer service duty is a principal activity of all the defendant's employees and that the actual place of performance is anywhere on the floor, so walking time, where an employee may encounter a customer, is compensable. Id.

4. *The Court's Analysis*

Under the FLSA, an employee must be compensated for "principal activities." Chagoya v. City Of Chicago, 992 F.3d 607, 617-18 (7th Cir. 2021). Principal activities are the activities employees are employed to do. 29 C.F.R. §790.8(a). A principal activity also includes all activities that are "integral and indispensable" to the activities the employee is hired to perform. Chagoya, 992 F.3d at 618; 29 C.F.R. §790.8(b). An activity is integral and indispensable to the principal activities if "it is an intrinsic element of those activities and one with which the employee cannot dispense if he is to perform those activities." Integrity Staffing Sols., Inc. v. Busk, 574 U.S. 27, 33 (2014).

Not all work-related activities are compensable under the FLSA. The FLSA does not apply to "walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform[.]" 29 U.S.C. §254(a)(1). The FLSA does not apply to an employee's preliminary or postliminary activity. Id. at §254(1)(2); Chagoya, 992 F.3d at 617. A "preliminary activity" is "an activity engaged in by an employee before the commencement of his 'principal' activity or activities." 29 C.F.R. §790.7(b).

The parties dispute whether the employees' walking time is a principal activity. Supreme Court case law offers some guidance. In Steiner v. Mitchell, 350 U.S. 247 (1956), the Supreme Court held that battery-plant employees changing clothes at the beginning of a shift and showering at the end of the shift where they came in contact with dangerously caustic and toxic materials was part of their principal activity. Id. at 248. Similarly, the Supreme Court held that the knife-sharpening activities performed by employees of a meatpacking plant before or after shifts were part of their principal activities because they needed the sharp knives to perform their butchering operations. Mitchell v. King Packing Co., 350 U.S. 260, 263 (1956).

In contrast, time spent waiting to don protective gear was not a principal activity in a meat processing plant because it was "two steps removed from the productive activity on the assembly line." Alvarez, 546 U.S. at 42. In Integrity Staffing, the Supreme Court held that antitheft, post-shift security screenings were not principal activities for employees hired to retrieve inventory and

package it for shipment. 574 U.S. at 35. Integrity Staffing emphasized that an activity is not a principal activity merely because the employer requires it. Id.

More recently, the Seventh Circuit has held that the time it takes SWAT team operators to transport, unload and safely store work equipment in their homes was not "integral and indispensable," and thus was preliminary and postliminary rather than a principal activity. Chagoya, 992 F.3d at 622. The Seventh Circuit briefly touched on walking time in Sandifer v. U.S. Steel Corp., 678 F.3d 590 (7th Cir. 2012), aff'd, 571 U.S. 220 (2014)), when it found that steel workers' principal activity did not include the time they spent donning and doffing their work clothes in the locker room and did not include the time they spent walking to their workstations from the locker room and *vice versa.* Id. at 595-96.

In this district, Judge Stadtmueller found that employees of a temporary employment agency were not engaged in a principal activity when they waited to be assigned work in the morning, traveled to and from the worksite and waited to be picked up after the shift was over. Sanford v. Preferred Staffing Inc., 447 F. Supp. 3d 752, 756 (E.D. Wis. 2020).

The case law has defined the boundaries of integral and indispensable versus preliminary and postliminary in factory settings and waiting time by temp employees, but the parties have not cited any cases analyzing this issue in the retail or customer service context. At least one case, Finnigan v. Metro. Transp. Auth., Case No. 19-CV-0516, 2025 WL 963998 (E.D.N.Y. Mar. 31, 2025), dealt with a similar fact pattern to the one in this case. In Finnigan, an

FLSA collective of New York City train operators alleged that the defendant, their employer, violated FLSA overtime rules because the workers' paid work time ended when their train entered the final station, but, under some circumstances, the train operators had to walk to the office to clock out. Id. at *2-*3. The plaintiffs argued that this walking time was compensable under the FLSA because, during the walk, customers would ask them questions and this customer service was integral and indispensable to their principal activities. Id. at *5. At summary judgment, the court, "taking into account both the record before it, and common sense," found "there [was] a genuine question of material fact as to whether Plaintiffs provide customer service during their end-of-shift walk to the dispatch office and whether providing this customer service is an integral and indispensable part of Plaintiffs' employment." Id.

Here, there is no genuine question of material fact as to whether providing exceptional customer service is what the defendant hired the employees to do, and no question that providing exceptional customer service is a principal activity. From advertising open positions to training new employees to actual practice, the record shows that the defendant's employees were hired to offer exceptional customer service. In hiring advertisements, the defendant lists customer service as a duty for its employees. The defendant's hiring fliers for checkers, baggers and stockers included as a job duty providing great customer service. Dkt. No. 353 at 1-2. Stockers had the duty to "[a]ssist customers reach and/or locate products[.]" Id. at 2.

It is undisputed that customer service is a primary job responsibility for the defendant's employees. See Dkt. No. 387 at ¶10, 12, 14-18, 23; see also Dkt. No. 341-5 at 38 ("[The defendant's] employees are asked to provide exceptional customer service to our customers."). The defendant's orientation presentation for new employees repeatedly emphasizes customer service. One of the first slides in the presentation tells new employees that providing service in a customer-friendly atmosphere is one of the three parts of the defendant's mission statement. Dkt. No. 358 at 4. The presentation repeats multiple times the importance of customer service and the expectation that employees provide exceptional customer service. Id. Employees are trained to stop, smile and talk to a customer whenever they come into eye contact with one. Id.

The defendant quizzes its employees about the importance of customer service. Dkt. No. 359. Through this quiz, employees are taught that customers are the most important part of the defendant's business. Id. at 3. The quiz tells employees they must say, "hello," "thank you" and "have a nice day" to "each and every customer." Id. The quiz tells employees that they must take or show the customer to an item if the customer asks about a particular product. Id.

The defendant's personnel policies and guidelines and the employee handbook display the same emphasis on customer service. The first page lists several "simple rules" that the president of the defendant wishes every employee to follow. Dkt. No. 349 at 2. The first and last of these rules are geared toward customer service: "Smile, say 'Thank You' and 'Have a Nice Day'" and "Say 'Hello', 'Thank You', 'Have a Great Day', and SMILE." Id. at 2. The

wording of the rules themselves, their place on the first page of the handbook and the fact they bookend the first list of rules, are illustrative of the defendant's policy: employees must offer excellent customer service—something the defendant reminded employees of four times a year in Clint Woodman's (the defendant's president) quarterly letters to employees. See generally Dkt. No. 370.

This policy is reiterated and tied to other rules all over the handbook. For instance, the introductory sentence of "Section 2: Dress Code" is "Name badges worn by employees help create a friendlier and more personal store atmosphere." The first sentence under "Section 6: Attendance" is "Good attendance is very important to provide exceptional customer service." Id. at 13. Employees' schedules are created and maintained to least inconvenience the customers. Id. at 7. The employees' "[b]reaks are given at a time when they least interfere with the smooth operation of the store or service to the customer." Id. at 4. Under the defendant's "Rules for General and Safety Conduct," it is a group #2 violation to engage in "discourteous treatment of customers." Id. at 21. More than five group #2 violations in a twelve-month period result in demotion or termination. Id. at 20. The defendant instructed employees that they were "on the clock working" once they clocked in. Dkt. No. 358 at 14-15.

Turning to the more specific activity of walking time, it is undisputed that the employees provided customer service on their walks to and from the time clock. It also is undisputed that providing exceptional customer service

was integral and indispensable to employees' principal job responsibilities. The logical conclusion is that the customer service the employees provide during their time walking to and from the time clock is a principal activity that is an integral and indispensable part of their jobs. "[I]t is an intrinsic element of [providing exceptional customer service] and one with which the employee cannot dispense if he is to perform those activities." See Integrity Staffing, 574 U.S. at 33. Responding to customers during walks to and from the time clock is an intrinsic element of the defendant's exceptional customer service and a principal activity, as evidenced by the fact that employees could be disciplined for ignoring a customer. Dkt. No. 347-6 at 116:3-25. There is nothing in the record to suggest that the defendant's training on exceptional customer service did not apply to this walking time. Nothing in the handbook, training materials or employee depositions supports the conclusion that it was acceptable for employees to ignore customers on their walks.

Although the defendants dispute the frequency of occurrence, there is no dispute that the defendant's employees encountered customers on their walks. The evidence in the record shows that the employees were, at the very least, trained and required to stop and talk to customers when they encountered them. Dkt. No. 349 at 2; Dkt. No. 359 at 1. The defendant's argument about the frequency of customer interactions on the walk, even if the court were to accept it, does not change this undisputed fact. The principal activity here is interacting with customers during walks to and from the time clock. The fact that customer interactions did not occur during every walk does not transform

the character of the activity itself, which the defendant considers to be an essential element of employees' job responsibilities.

The defendant characterizes the walking time as "duty free" and merely pre- and postliminary to the actual performance of the employees' principal activity which, it argues, takes place only at their assigned workstations. Dkt. No. 341 at 13-14. The defendant's arguments are unpersuasive. The defendant downplays its own emphasis on customer service in its hiring, training and practices. The undisputed facts demonstrate, unequivocally, that the defendant considered exceptional customer service a principal activity for its employees.

In arguing that the walking time was merely pre- or postliminary, the defendant principally relies on cases involving a factory setting or in scenarios where the plaintiffs had to deal with equipment in some way. See, *e.g.*, Alvarez, 546 U.S. 21; Sandifer, 678 F.3d at 596; Chagoya, 992 F.3d 607. The courts in those cases analyzed how the FLSA applied to employees dealing with necessary equipment before and after shifts, where it was beyond question that the principal activity for which the plaintiffs were hired occurred at a particular workstation. The walking time at issue here is substantially different from the walking time in those cases.

The court is more persuaded by the reasoning in Finnigan, 2025 WL 963998. There, as here, the plaintiff train operators had customer service interactions during their walks to clock out. Id. at *2-*3. The New York court did not conclude that the train operators' customer service activities were postliminary; it held that they could be principal activities based on the

evidence presented in that case. Id. at *5. But because there were genuine issues of material fact as to whether the train operators' customer service activities provided during walking time were an integral and indispensable part of their train operator job responsibilities, the court denied summary judgment and allowed this issue to go to trial. See id.

What sets this case apart from Finnigan is the absence of any genuine dispute of fact that customer service is a principal activity of the defendant's employees. Customer service is an essential part of their jobs. Indeed, the defendant considered exceptional customer service the "lifeblood" of its stores. Whether the defendant's employees provide customer service at their work stations or during their walk to and from the time clock does not change the character of the activity. There is no genuine issue of material fact on this issue, which means that summary judgment in the plaintiffs' favor on this issue for purposes of the FLSA is warranted.

Turning to the plaintiffs' state law claims, Wisconsin has not wholesale adopted the FLSA or federal court interpretations of the accompanying regulations. See Weissman v. Tyson Prepared Foods, Inc., 350 Wis. 2d 380, 404-05 (Wis. Ct. App. 2013). But Wisconsin courts do use federal cases to assist in analysis when the Wisconsin employment regulations are substantially similar to federal regulations. United Food & Com. Workers Union, Loc. 1473 v. Hormel Foods Corp., 367 Wis. 2d 131, 152 (Wis. 2016). A Wisconsin court used federal cases when analyzing "principal activities" under Wis. Admin. Code §DWD272.12(2)(e) because the language from the Wisconsin

regulation mirrors the applicable FLSA regulations. See Hormel, 367 Wis. 2d at 151-57; compare Wis. Admin. Code §DWD272.12(2)(e) with 29 C.F.R. §790.8. The same is true of Illinois law. 820 ILCS 115/12; 56 Ill. Adm. Code 210.120. Because Wisconsin and Illinois law look to the FLSA and federal court decisions interpreting the FLSA, the court will grant summary judgment in favor of the plaintiffs on the walking time issue as to the state law claims on the same basis.

B. The Wyngaard and Hunter WWPCL Meal Period Claims

The WWPCL meal period plaintiffs, Wyngaard and Hunter, have two claims: (1) the defendant violated the WWPCL by failing to pay Wisconsin employees for meal periods lasting less than thirty minutes and (2) the defendant violated the WWPCL by failing to include this pay in Wisconsin employee overtime calculations. Dkt. Nos. 247 at 35-36, 248 at 37-38. Both parties moved for summary judgment on these claims.

1. *Background Facts*

The defendant trained and expected its employees to clock out for a maximum of twenty-nine or fifty-nine minutes for their meal periods. Dkt. No. 341-3 at 98:22-99:91; Dkt. No. 349 at 5. Its orientation slides state that "[l]unch periods vary from twenty-nine (29) minutes to fifty-nine (59) minutes and **MUST** be taken on the quarter hour." Dkt. No. 358 at 16. The defendant's policy of rounding punches to the nearest quarter hour means that the employees must have punched out no more than seven minutes after the

quarter hour. Id. If an employee missed their punch, the employee had to go back to work and take their break on the next quarter hour. Id.

The defendant trained employees that they always must punch in one minute prior "to the quarter hour thirty (30) minutes after [the employee] punched out." Id. The defendant expected the same for the fifty-nine-minute meal break. Id. The defendant provided some examples of twenty-nine-minute breaks to illustrate this policy: "Punch out at 1pm, punch in at 1:29pm[;] Punch out at 1:01pm, punch in at 1:29pm[;] Punch out at 1:02pm, punch in at 1:29pm[;] Punch out at 1:03pm, punch in at 1:29[.]" Id.; see also Dkt. No. 359 at 2 (employee quiz illustrating the punch-out policy).

This twenty-nine minute punch out/in policy was reflected in practice. Jesse Wyngaard stated in his deposition that he was required to punch in one minute before his meal break was scheduled to end. Dkt. No. 347-5 at 40:03-6. Hunter and Barnes testified to the same. Dkt. No. 347-3 at 71:20-72:07; Dkt. No. 347-1 at 66:03-16. Dkt. No. 347-1 at 66:03-16. Robertson said he punched in before his breaks were scheduled to end. Dkt. No. 347-4 at 52:17-24.

Popp stated that this punch out/in policy was designed to allow employees to be at their workstation at the time their shift started. Dkt. No. 347-10 at 106:12-11. Training and development coordinator Sarah Bin confirmed that new employees were trained that lunches vary between twenty-nine minutes and fifty-nine minutes. Dkt. No. 347-6 at 130:12-131:4.

Despite the twenty-nine-minute punch out/in policy, the defendant sometimes communicated that breaks were thirty-minutes. On the defendant's

"Checklist for Employee giving Orientation," employee trainees are taught that "Lunch and Break (29 minutes punched is ½ hour. Must work 6 hours to take ½ hour lunch.)" Dkt. No. 355 at 1. Some versions of the checklist state that "59 minutes punched is one hour." Id. at 3. The defendant' employee policies and guidelines stated that "hours of work shall be consecutive, excepting a meal period of not less than one-half (½) hour nor more than one (1) hour at approximately the middle of the work day." Dkt. No. 349 at 5. The defendant's "Orientation Quiz" asked the employees a true false question: "All meals (lunches) are 30 minutes in length." Dkt. No. 359 at 1. The correct answer is false because meals also can be sixty minutes. Id.

2. *The Defendant's Meal Period Argument*

The defendant makes two main arguments when arguing for summary judgment: (1) that it provided full thirty-minute meal periods because the employee's walking time was part of their break and (2) even if the periods were less than thirty minutes, the breaks are not compensable because meal periods are compensable only when the employee is engaged in activities primarily benefiting the employer.

The defendant argues that "[c]locking in early does not convert an unpaid break to paid, especially with the addition of paid, duty-free walking time." Dkt. No. 341 at 11. The defendant cites Barefield v. Village of Winnetka, 81 F.3d 704, 710 (7th Cir. 1996), for the position that "the compensability of a meal period depends on the employee's freedom during the break." Id. It argues that the plaintiffs "do not claim that they had any duties during their meal period."

Id. It asserts that the plaintiffs were not expected to work during their breaks and that the plaintiffs admitted that their supervisors did not ask them to do so. Id. at 11.

The defendant admits that "[t]he WWPCL requires that unpaid breaks must be at least 30 minutes" and that it required its employees to clock out for only 29 minutes, but argues that the "Plaintiffs were afforded the opportunity to take a full, uninterrupted thirty-minute meal break [] because they unequivocally had, at bare minimum, a combined total of 4 minutes of walk time on the front and back end of their meal periods in which they were engaged in noncompensable walk time[.]" Id.

The defendant argues that written policies are not dispositive and that what matters is actual practice. Id. It maintains that what the plaintiffs have characterized as policies—the defendant's orientation quizzes and PowerPoint training presentations telling employees to only take a twenty-nine-minute meal break—are not actual policies. Id. at 13. Rather, the defendant argues, its policies are laid out in its handbook, which it claims states that meal breaks should be at least thirty minutes. Id.

The defendant relies on Wirth v. RLJ Dental, S.C., 59 F.4th 270 (7th Cir. 2023) in support of its argument that the plaintiffs cannot be compensated for meal periods if they chose to clock out before reaching thirty minutes. Id. at 14-15. It also relies on Gomez v. V Marchese & Co., Case No. 20-cv-1802, 2023 WL 4059090, *4-5 (E.D. Wis. Feb. 7, 2022), which it says "recogniz[ed] that an employee's decision to shorten their meal break does not make it compensable,

where an employer has scheduled and provided an opportunity for a 30 minute meal break." Id. at 15. The defendant argues that it was compensating the plaintiffs for the time they were walking (clocked in but not working), and "[e]ven the policy that employees clock in at the 29-minute mark to accommodate a 2 to 7 minute walk to their workstation cannot create a triable issue of fact that [the defendant's] employees were not provided a full 30 minutes of uninterrupted break because this policy did not impact the actual time off employees were provided and took for meal periods." Id.

The defendant asserts that Alexander v. City of Chicago, 994 F.2d 333, 340 (7th Cir. 1993) makes clear that meal periods are compensable only when the employee is engaged in activities primarily benefiting the employer. Dkt. No. 388 at 11. The defendant claims that the plaintiffs never asserted that they were interrupted by supervisors or asked to return to work early. Id. at 11. The defendant contends that "courts have been clear that completion of a small task will not convert a break to compensable time." Id. at 12 (citing Alexander, 994 F.2d at 337 and Mitchell v. JCG Indus. Inc., 745 F.3d 837, 845 (7th Cir. 2014)). The defendant argues that, if anything, the plaintiffs' customer service duties while walking were minimal and not a primary activity during the meal break. Id.

3. *The Plaintiffs Meal Period Arguments*

The plaintiffs argue that the court should grant summary judgment for the Wisconsin meal period subclass's claims because the defendant did not provide thirty-minute meal periods. Dkt. No. 380 at 27. They argue that

Wisconsin law mandates that rest periods and meal periods lasting less than thirty minutes are compensable hours worked. Id.

The plaintiffs argue that the defendant's policies and practices have deprived employees of a thirty-minute meal period. Id. at 29. They assert that regardless of when the employee clocks out for a meal break, the employee must clock in at least one minute prior to end of their scheduled meal break, meaning that an employee who clocks out at 1:04 still must clock in at 1:29 despite their break being scheduled from 1:00-1:30. Id. The plaintiffs maintain that the defendant trains all its employees to "*understand that they have a 29-minute meal period*." Id. The plaintiffs also point out that if an employee fails to clock in at least one minute before the end of their scheduled break, they can be disciplined and have their pay deducted. Id.

The plaintiffs argue that because employees' walking time was compensable under the WWPCL, the defendant's argument is invalid. Dkt. No. 382 at 17. They maintain that the defendant's requirement—that if an employee leaves for a break but cannot clock out within seven minutes of a quarter hour, then the employee must return to work—means the defendant did not really believe the employee was completely relieved from duty. Id. at 18.

The plaintiffs also argue that the defendant's attendance policy was so punitive that many employees spent less than thirty total minutes away from their departments for their breaks. Id. The plaintiffs counter the defendant's contention that it does not penalize employees who were only away for a few minutes longer than thirty minutes by pointing to a table of the clock-in

numbers of employees who were disciplined for being more than two minutes late coming back from break. Id. at 18-19.

#### 4. *The Court's Analysis*

The Wisconsin Department of Workforce Development has promulgated administrative rules for interpretating hours worked. Wis. Admin. Code §DWD272.12. The regulation states that employees "must be paid for all time spent in physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer's business." Id. at §DWD272.12(1)(a)(1). Employees also must be paid for short "rest periods," defined as breaks "running less than 30 minutes[.]" Id. at §DWD272.12(2)(c)(1). The regulation distinguishes compensable rest periods—breaks less than thirty minutes—from non-compensable meal periods—breaks longer than thirty minutes where the employee is completely relieved from duty. The regulations state that "meal periods"—breaks lasting thirty minutes or longer during which employees are "completely relieved from duty for the purposes of eating regular meals"—are not compensable. Id. at §DWD272.12(2)(c)(2). The WWPCL, Wis. Stat. §109.11(2), allows employees to sue their employers for unpaid wages.

In Wirth, the Seventh Circuit analyzed the Wisconsin meal break regulation. The plaintiff, an office manager at a dentist's office, voluntarily took meal breaks of less than thirty minutes, despite the office closing over the lunch hour and her supervisor telling her that she needed to take her full lunch break. Wirth, 59 F.4th at 271. Relying entirely on the plain text of

§DWD272.12, the Seventh Circuit held that the employer had not violated the WWPCL because it provided a meal break lasting at least thirty minutes. Id. 272. The court reasoned that the plaintiff could not transform her non-compensable meal break into a compensable rest break by voluntarily clocking in after less than thirty minutes. Id. The Seventh Circuit explained that "[t]he Wisconsin regulatory scheme focuses on what the employer provided, not what the employee elected." Id.[9]

The Wisconsin Court of Appeals analyzed §DWD272.12 in Freeman v. SL Greenfield, LLC, 416 Wis. 2d 388 (Wis. Ct. App. 2025), when it affirmed the trial court's grant of class certification. The plaintiff alleged that her employer had violated the WWPCL by refusing to pay employees for meal periods that lasted fewer than thirty minutes. Id. at 391. The alleged common question in the case was, "[i]s a break taken by a class member lasting fewer than thirty consecutive minutes a 'rest period,' in which case [the defendant] owes compensation, or a 'bona fide meal period,' in which case [the defendant] does not owe compensation?" Id. at 398. In determining that the trial court had correctly found there was commonality for the purposes of class certification, the court opined that "the plain language of § DWD 272.12(2)(c) . . . creates a bright-line rule: a break running fewer than thirty consecutive minutes in

[9] The Wirth court did not describe its holding as a "bright-line" rule. But it found that under §DWD272.12, meal periods of thirty minutes or more during which the employee was completely relieved of duty for the purposes of eating a regular meal were not compensable, and that an employee couldn't make such periods compensable by deliberately taking a shorter lunch break. Wirth, 59 F. 4th at 272.

duration cannot, by definition, be a bona fide meal period." Id. at 399. Like Wirth, Freeman relied entirely on the plain language of the regulation in analyzing §DWD272.12 to conclude that the regulation created a "bright-line rule." See id.[10]

In this case, the record shows that the defendant did not provide meal periods lasting at least thirty minutes. There is no genuine dispute over this material fact: the defendant's punch out/in policy and practice allowed its employees to be "punched out" on the time clock for only twenty-nine minutes at most—less should the employee clock out after their break was scheduled to start. See Dkt. No. 359 at 2. While there is some evidence—like the orientation quiz (dkt. no. 359) and the handbook (dkt. no. 349 at 5)—that states that the employees' meal periods were supposed to be thirty minutes, it is undisputed that the employees were trained to take, and the defendant's practice was to only allow, twenty-nine-minute breaks. Although the orientation quiz and the handbook nominally provide that employee breaks should be thirty minutes, they cannot override the undisputed fact that the defendant's punch out/in

[10] This court has found that the Freeman decision appears to conflict in some ways with the Seventh Circuit's decision in Wirth, noting that in Freeman, the trial court certified the class without any adversary litigation or evidence that the employer gave employees a period of at least thirty minutes free from work. Gomez v. V. Marchese & Co., Case No. 20-cv-1802, 2026 WL 2766981, at *17 (September 17, 2026). The court conducted that discussion in the context of a class certification motion, as it attempted to determine whether the plaintiffs had met the commonality requirement for class certification. The issues the court was addressing in Gomez are not relevant to the summary judgment question here—where the defendant was required to provide employees with a thirty-minute, duty-free break.

policy and practice required that employees clock out for only twenty-nine minutes at most.

The defendant admits that its employees were required to clock out for at most only twenty-nine minutes for meal periods, but rationalizes its twenty-nine minute punch out/in policy with its argument that the employees' walking time was part of their meal break. Dkt. No. 341 at 11. Because the court already has determined that the walking time is a compensable principal activity, the defendant's argument is unpersuasive. Applying Wisconsin's rule under Wis. Admin. Code, §DWD272.12(2)(c)(1), the break periods at issue in this case were compensable "rest periods" because the defendant's punch out/in policy limited its employees' meal breaks to less than thirty minutes. In other words, the defendant's twenty-nine-minute punch out/in policy "cannot, by definition, be a bona fide meal period." Freeman, 416 Wis. 2d at 399.

The defendant's separate argument that "the compensability of a meal period depends on the employee's freedom during the break" dkt. no. 341 at 11, is unpersuasive and not applicable. This argument is based on the "predominate benefits test" that the Seventh Circuit adopted to determine "whether meal periods are work periods" under the FLSA. Barefield v. Vill. of Winnetka, 81 F.3d 704, 710 (7th Cir. 1996). "Under this test, a meal period is not work time if the employee's time is not spent predominantly for the benefit of the employer." Id. (citation modified).

The question here is whether the break provided by the defendant is a rest period or a meal period under *Wisconsin* law, not the FLSA. And the courts

that have analyzed this question have concluded that the Wisconsin legislature established a bright line rule for when there is no dispute that the employer has provided less than thirty minutes for a meal period. See Wirth, 59 F.4th at 727; Freeman, 416 Wis. 2d at 399. The fact that the employee's break may not have been spent predominantly for the benefit of the defendant does not transform the break into a *bona fide* meal period under §DWD272.12(2)(c)(1).

In a case where the plaintiffs argued that their meal periods were compensable under §DWD272.12(2) because the employer had placed certain restrictions on what the plaintiffs could do during their breaks, Judge Barbara Crabb in the Western District of Wisconsin applied the "predominate benefits" test. Boelk v. AT & T Teleholdings, Inc., Case No. 12-CV-40, 2013 WL 261265, at *9 (W.D. Wis. Jan. 10, 2013). The question in Boelk was whether the plaintiffs were "completely relieved from duty for the purposes of eating regular meals," see id. at *6, *8, making the predominate benefits test applicable. Notably, neither Freeman nor Wirth, both of which were decided after Boelk, applied the predominate benefits test when analyzing the meal periods.

The court will grant the plaintiffs' motion for summary judgment on their WWPCL subclass claims and deny the defendant's motion on that same issue.

While the argument is not entirely fleshed out, the defendant argues that the *de minimis* doctrine should apply to the plaintiffs' meal period claims. Dkt. No. 385 at 12. This doctrine, however, has no place in the plaintiffs' meal period claims. The *de minimis* doctrine "allows employers to disregard otherwise compensable work when only a few seconds or minutes of work

beyond the scheduled working hours are in dispute." Kellar v. Summit Seating, Inc., 664 F.3d 169, 176 (7th Cir. 2011). The plaintiffs' meal period claims are about how long a break the defendant provided its employees and whether the break qualified as a bona fide, uncompensable meal break under Wisconsin law. The *de minimus* doctrine is inapplicable.

C. The FLSA, WWPCL, IWPCA and IMWL Time-shaving Claims

There are three subclasses and three FLSA collectives with time-shaving claims: the WWPCL Timeshaving Subclass, the IWPCA Timeshaving Subclass (regular rate), the IMWL Timeshaving Subclass (overtime rate), the Wyngaard FLSA Time-shaving Collective, the Hunter FLSA Time-shaving Collective and the Robertson FLSA Time-shaving Collective. The WWPCL and IMWL subclasses and the FLSA collectives share the same allegation that the defendant violated the relevant law by failing to include the shaved time in employees' overtime. The IWPCA subclass alleges that the defendant violated the IWPCA by failing to include the shaved time in employees' regular wages.

1. *Background Facts*

The defendant had a rounding policy that it used for each of its employees' timeclock punches. Dkt. No. 383 at ¶27; Dkt. No. 387 at ¶62. The defendant rounded each of its employees' punches to the nearest quarter hour. Dkt. No. 387 at ¶62. Popp explained that an employee's punch is rounded back until seven minutes after the quarter hour and rounded up eight minutes after the quarter hour. Dkt. No. 341-3 at 196:6-197:16. For example, if an employee punches at 5:07, the defendant would round the punch back to 5:00, and if an

employee punches at 5:08, the defendant would round the punch forward to 5:15. Id. at 197:14-16.

In addition to the meal period policy requiring employees to punch in one minute before their break was supposed to end, the defendant required its employees to punch in at least one minute before their shift was scheduled to start. Dkt. No. 387 at ¶87; Dkt. No. 358 at 14. The defendant's orientation slides instruct employees that "[w]hen punching in for the beginning of your shift, you **MUST** punch in *at least* one minute before the start time listed on your schedule. This allows you to be at your work area at the starting time of your shift." Dkt. No. 358 at 14 (emphasis in original). Sarah Bin testified that employees were not permitted to punch in more than five minutes before they were scheduled to start, noting that that period had been increased from three minutes. Dkt. No. 347-6 at 126:24-127:8. For punching out, the slides instruct employees that they must not punch out more than three or seven minutes[11] after the scheduled end of their shift. Dkt. No. 358 at 17. The defendant's orientation quiz taught new employees that punching in on the hour they were scheduled to start meant that they were late. Dkt. No. 359 at 1 ("If I am scheduled at 9am and I punch in at 9 am, I am not late." Answer: false).

The defendant had a no-fault attendance policy. Dkt. No. 349 at 13. The handbook explained the policy: "Our 'No-Fault Attendance Program' eliminates the fault as a basis for determining whether an absence, late arrival or early

[11] The orientation slide in Dkt. No. 358 says three minutes, but the slide at Dkt. No. 341-13 says seven minutes.

departure is excused or unexcused. Under our No-Fault policy, you are either at work or absent. If you are absent, leave early or are tardy, you will receive 'points' and progressive action steps will take place." Id. at 14. Employees received half a point for "[a]n accumulated combination of any 3 (A, B, C or D) in one month [as] an occurrence: Maximum 1-2 minutes A. Late for work, B. Late back from lunch, C. Long breaks, D. Other missed swipes not included in d.ii." Id.[12] The plaintiffs referred to these as "Code 8" violations in their proposed finding of fact. Dkt. No. 387 at ¶94. The defendant recorded the employees' points and levied discipline, ending in termination after full-time employees reach six points. Dkt. No. 349 at 16-17.

The plaintiffs' attorney David Potteiger's declaration includes a table of Code 8 violations based on the exhibits in Dkt. Nos. 372-374 and "WOODMANS1584, WOODMANS15288-15292, and WOODMANS58149-58783."[13] Dkt. No. 347 at 6. The table shows twenty-six examples of Code 8 violations spanning 2018 to 2022 for employees punching in late by one to two minutes. Id.

---

[12] The defendant's No-Fault policy includes a classification of eight different types of "occurrences." See, *e.g.*, Dkt. No. 364 at 1. This half-point occurrence is listed as the eighth classification in the No-Fault policy. Id. The plaintiffs referred to the eighth category as "Code 8" violations in their proposed finding of fact. Dkt. No. 387 at ¶94. For the sake of brevity, the court will refer to these as Code 8 violations.

[13] Potteiger's declaration attests that the defendant produced WOODMANS1584, WOODMANS15288-15292, and WOODMANS58149-58783 in an excel format that "cannot be conveniently appended as an exhibit but can be made available . . . upon request by the court." Dkt. No. 347 at 55.

The plaintiffs' expert, Ronald Bero, authored a report that opines as to the alleged damages of the plaintiffs and includes an opinion on how much working time was shaved off the plaintiffs' working hours. Dkt. No. 391. Using the defendant's raw punch clock data, Bero found that from April 5, 2016 to April 4, 2019, the Wyngaard FLSA Collective lost 3,613.13 hours and found that from April 6, 2019 and July 31, 2023, the Hunter and Roberston FLSA Collectives lost 10,998.23 hours. Dkt. No. 387 at ¶¶66-67. This totals 14,611.36 hours. Bero found that only one member of the Wyngaard FLSA Collective benefited (gaining only seven minutes), and twelve people in the Hunter and Robertson FLSA Collectives gained only 15.84 hours. Id.

The defendant's expert, Richard Goldberg, disputed Bero's conclusions, primarily by arguing that Bero needed to account for the purported duty-free walking time. Dkt. No. 341-6. Goldberg opined that using only the raw punch data to calculate how many hours were shaved provided inaccurate results. Id. at 8. Goldberg found that by incorporating a "low-end" estimate of the walking time, the plaintiffs actually benefitted from the rounding policy. Id. at 8-9.

2. *The Defendant's Time-shaving Argument*

The defendant argues that the plaintiffs' time-shaving claims are not actionable because they are *de minimis*. Dkt. No. 341 at 16. It argues that courts have used the *de minimis* doctrine when uncompensated periods were only a few minutes and claims that courts have found "daily periods of approximately 10 minutes *de minimis*[.]" Id. at 16-17 (quoting Kellar, 664 F.3d

at 177, and citing Mitchell, 745 F.3d 837, and Laverenz v. Pioneer Metal Finishing, LLC, 746 F. Supp. 3d 602 (E.D. Wis. 2024)).

The defendant argues that neutral rounding is permissible, that *de minimis* underpayment as a result of neutral rounding is permissible and that courts should offset rounding by other paid breaks (such as the walking time) not required by the FLSA. Id. at 17.

The defendant contends that the losses alleged by the plaintiffs for rounding, offset by the paid duty-free walking-time, are miniscule. Id. at 18. It claims that the plaintiffs' shifts "were impacted by *fewer than 4 seconds* on average as a result of the rounding policy when accounting for the walking time." Id. (emphasis in original). The defendant maintains that when factoring in the walking time from the beginning of a shift, the break and the end of a shift, over 70% of employees benefitted from the defendant's rounding policy. Id.

The defendant claims that "it is undisputed that rounding more accurately represents the time employees worked because it accounts for the duty-free walk time on the beginning, middle, and end of work shifts." Id. It argues that, again with the walking time, the impact of rounding was favorable to the plaintiffs. Id. The defendant claims that "*89.3% of shifts had rounding of less than five minutes and none of the rounding occurred in increments of larger than 10 minutes.*" Id. (quoting Dkt. No. 341-1 at ¶76) (emphasis in original). The defendant maintains that rounding is a practical administrative solution to avoid having a time clock at every workstation. Id.

The defendant contends that even including customer conversations during walking time would result in a *de minimis* loss. Id. The defendant argues that the industrial realities of its work "dictate that the *de minimis* doctrine apply" and that rounding is permitted by the FLSA. Dkt. No. 385 at 14. The defendant revisits its walking time argument. Id. It argues that its employees' varied walking time, during which they are "not encumbered by the employer, other than occasionally smiling[,]" creates an administrative difficulty. Id. It says that it cannot place punch clocks at each of its employee's workstations so it must use rounding to accurately capture what it claims is employees' working time. Id. The defendant argues that using the raw punch data to overcome the administrative difficulties does not work because it does not address the variable walking time. Id.

The defendant counters the plaintiff's claim that the employees are each owed $937 for the rounding discrepancies. Id. at 15. It asserts that the plaintiffs' expert calculation is inaccurate because it does not account for overpayments employees received due to the defendant's rounding. Id.

The defendant also argues that its rounding policy is neutral. Dkt. No. 388 at 7. The defendant disagrees with the plaintiffs' argument that its no-fault attendance policy changes the policy's neutrality. Id.

3. *Plaintiffs' Time-shaving Argument*

The plaintiffs argue that the *de minimis* doctrine does not apply because the defendant's "timeclock rounding practice runs afoul of 29 C.F.R. § 785.48(b) because it is not neutral in practice." Id. at 21, 21 n.10. The

plaintiffs contend that a facially neutral rounding system that rounds to the nearest quarter hour is lawful under the FLSA only when "*used* in such a manner that it will not result, over a period of time, in *failure to compensate the employees properly for all the time they have actually worked*." Dkt. No. 380 at 16 (quoting 29 C.F.R. §785.48(b)) (emphasis in quotation). The plaintiffs state that "[t]his language unambiguously indicates that even a rounding system that includes a neutrally programmed timeclock may be converted to a non-neutral rounding system when it is used in a manner that disproportionately benefits an employer and deprives employees of compensation for all hours worked." Id.

The plaintiffs cite Hardy v. Lewis Gale Med. Ctr., LLC, 377 F. Supp. 3d 596, 615 (W.D. Va. 2019), for its purported holding that the employer's fifteen-minute rounding policy was not neutral because of its policy encouraging employees to clock in early and punishing them for clocking out late. Dkt. No. 380 at 17-18. The plaintiffs also cite Gibson v. Outokumpu Stainless Steel USA, LLC., Case No. 21-00103, 2023 WL 2604812 (S.D. Ala. Mar. 22, 2023), where the court decided on summary judgment that the employer's rounding policy was not neutral and was unlawful because the employees would be disciplined for clocking in more than seven minutes early or clocking out more than seven minutes late. Id. at 18 (citing Gibson, 2023 WL 2604812 at *10). They claim that in Koch v. Jerry W. Bailey Trucking, Inc., 482 F. Supp. 3d 784 (N.D. Ind. 2020), the court found that a similar rounding policy was unlawful. Id.

The plaintiffs state that the defendant's rounding policy, combined with its no-fault attendance policy and clock-in requirements, resulted in a rounding policy that disproportionally benefitted the defendant and is unlawful. Id. at 19. The plaintiffs break down their expert's data, claiming that the 739 FLSA opt-in plaintiffs lost 14,611 hours to rounding and that only thirteen opt-in plaintiffs benefited by just sixteen hours. Id.

The plaintiffs state that the Seventh Circuit and Illinois courts "have held that the *de minimis* doctrine 'applies only where there are uncertain . . . periods of time involved of a few seconds or minutes duration, and where the failure to count such time is due to considerations justified by industrial realities . . .'" Dkt. No. 382 at 23 (quoting Kellar, 664 F.3d at 176). The plaintiffs argue that there are no uncertainties with the defendant's rounding issue. Id. They point out that the defendant kept accurate records of employees' raw time data. Id. The plaintiffs argue that the defendant "requires and considers Store Employees to be 'on the clock working,' immediately after clocking in, and to remain working until such time that they clocked out." Id. The plaintiffs argue that these facts show that there are no uncertainties that would make the *de minimus* doctrine applicable. Id. at 23-24. The plaintiffs also contend that "whether any measure of time is *de minimis* is generally a question of fact to be determined by a jury." Id. at 24 (citing Anderson, 328 U.S. at 692).

The plaintiffs argue that even if the *de minimis* doctrine applied, the time at issue here is not *de minimis*. Id. They contend that only after adding two to seven minutes per punch can the defendant "even begin to suggest that the

time at issue is *de minimis*," because "the actual difference in duration between Store Employee's raw time and rounded time is tens of thousands of hours and equates to tens of millions of dollars in lost wages." Id.

The plaintiffs argue that there are no administrative challenges necessitating the *de minimis* doctrine, because the defendant's system tracks both raw punch time and rounded punch time. Id. They also argue that additional, uncompensated work occurs regularly, multiple times every shift. Id. The plaintiffs assert that several courts that have considered similar amounts of aggregate amount of time concluded that it was not *de minimis*. Id. at 25 (citing Bartoszewski v. Village of Fox Lake, 269 Ill. App. 3d 978, 985 (Ill. App. Ct. 1995); Hormel, 367 Wis. 2d at 137; Piper v. Jones Dairy Farm, 390 Wis. 2d 762, 785 (Wis. 2020)). The plaintiffs claim that "the Opt-In Plaintiffs are owed, on average, $934.97 excluding statutory 'liquated' damages[,]" arguing this is not *de minimis*, especially for "ordinary people who work for hourly wages." Id. (quoting Troester v. Starbucks Corp., 5 Cal. 5th 829, 847 (Cal. 2018)).

4. *The Court's Analysis*

The FLSA permits rounding in some instances:

> It has been found that in some industries, particularly where time clocks are used, there has been the practice for many years of recording the employees' starting time and stopping time to the nearest 5 minutes, or to the nearest one-tenth or quarter of an hour. Presumably, this arrangement averages out so that the employees are fully compensated for all the time they actually work. For enforcement purposes this practice of computing working time will be accepted, provided that it is used in such a manner that it will

> not result, over a period of time, in failure to compensate the employees properly for all the time they have actually worked.

29 C.F.R. §785.48(b).

Under §785.48(b), a rounding policy is lawful if it is facially neutral and does not underpay employees in practice. Laverenz, 746 F. Supp. 3d at 618 (citing Houston v. Saint Luke's Health Sys., Inc., 76 F.4th 1145, 1150 (8th Cir. 2023); Aguilar v. Mgmt. & Training Corp., 948 F.3d 1270, 1288 (10th Cir. 2020); Corbin v. Time Warner Entm't-Advance/Newhouse P'ship, 821 F.3d 1069, 1075 (9th Cir. 2016)). But a rounding policy is not neutral if, in practice, it favors the employer by systematically underpaying employees. See Houston, 76 F.4th at 1150.

While any number of policies may be the cause, what makes a rounding policy not neutral in practice under §785.48(b) is systematic underpayment. The underpayment must be more than minimal. Laverenz, 746 F. Supp. 3d at 618. This is not an application of the *de minimis* doctrine, but an interpretation of the regulations. Id. (citing Adams v. Bloomberg L.P., Case No. 20-cv-7724, 2023 WL 5769492, at *6 (S.D.N.Y. Sept. 7, 2023)). "The federal regulation requires only that the arrangement 'averages out' such that employees are not *systematically* underpaid. That mandate is best read as leaving room for a de minimis amount of variance[.]" Id. (quoting Adams, 2023 WL 5769492, at *6) (emphasis in original). The regulation does not specify the "period of time" over which the rounding must average out, but it cannot be a "cherry picked" day or two. Id. at 618 (citing Corbin, 821 F.3d at 1077).

In Hardy, 377 F. Supp. 3d at 603, the defendant employer had a rounding system that rounded the employee's punches to the nearest quarter hour. The employer's policy required its employees "to clock in seven minutes prior to the start of their shifts—but not earlier than seven minutes—and disciplined them for clocking in after the start of their shifts[.]" Id. The defendant also had a policy that allowed employees to clock out up to seven minutes early if their replacement had arrived. Id. The plaintiff employees argued that this system, while facially neutral, systematically underpaid them. Id. Ruling on a motion to dismiss, the court found that it was plausible that these policies could result in systematic underpayment. Id. at 615. The court explained that underpayment was possible "if an employee regularly clocked in seven minutes before a shift and did not clock out seven minutes before the end of the shift." Id. The court also observed that "the policy could favor an employee if the employee regularly clocked in at the start of a shift and clocked out seven minutes early each day." Id.

In Austin v. Amazon.Com, Inc., Case No. C09-1679JLR, 2010 WL 1875811, at *1-*2 (W.D. Wash. May 10, 2010), the court found that the employee plaintiff stated a valid FLSA claim where the defendant employer had a fifteen-minute rounding policy and a policy that allowed employees to clock in seven minutes or less before their scheduled shift, but if the employees clocked in more than three minutes past their scheduled start time, the employees could be subject to discipline. The court explained that §785.48(b) "does not contemplate the situation where an employer allows rounding when

it benefits the employer without disciplining the employee; but disciplines the employee when the rounding does not work to the employer's advantage." Id. at *3.

Here, the parties agree that the defendant has a facially neutral rounding policy, but the raw punch data shows that the plaintiffs have been systematically underpaid, making the policy not neutral in practice and unlawful. The record shows that from April 5, 2016 through April 5, 2019, the Wyngaard FLSA Collective had a net loss of 4,613.13 hours. Dkt. No. 391 at 47-49. From April 6, 2019 through July 2023 the Hunter FLSA Collective had a net loss of 10,721.93 hours. Id. at 76-79. From December 13, 2021 through July 2023 the Richardson FLSA Collective had a net loss of 276.40 hours. Id. at 84.

The plaintiff's expert, Ronald Bero, found the above figures by taking the difference between the plaintiffs' raw punch times and the rounded punch times to determine if the rounding policy had impacted the plaintiffs' compensation. Id. at 8, 47-49, 76-69, 84. Having already determined that the undisputed record shows there is no genuine dispute that the plaintiffs were working during their walking time, the conclusions of the defendant's expert, Richard Goldberg, mirror those of Bero. Taking away the walking time, Goldberg's conclusions are identical to Bero's. Goldberg described his method as follows: "[t]o incorporate the duty-free walking time, two minutes were added to each shift's 'raw' in-punch and subtracted from each shift's 'raw' out-punch[;]" he did the same with meal period punches. Dkt. No. 341-6 at 8-9.

Goldberg says that this "estimated work time for each shift was then compared to the shift duration calculated from the rounded times in the data." Id. at 9. Without the walking time adjustment, Goldberg's analysis is the same as Bero's, meaning that there is no genuine dispute over this issue, because the court already has concluded that the walking time is compensable working time.

Furthermore, the aggregate underpayments are not minimal and cover a significant period of four years. The rounding deprived each Wyngaard plaintiff of around five hours per year, see id. at 49, the Hunter plaintiffs of around six hours, see id. at 79, and the Robertson plaintiffs of around eleven hours see id. at 84. This demonstrates that over time, the defendant's neutral rounding policy resulted in the systematic underpayment of employees. These aggregate underpayments are larger than those found to be minimal by other courts. See Laverenz, 746, F. Supp. 3d at 618 (finding 3.72 hours over two years, 5.49 over four years, and 1.81 over four months minimal); Vasquez v. Victor's Café 52nd Street, Inc., Case No. 18-CV-10844, 2019 WL 4688698, at *4 (S.D.N.Y. Sept. 26, 2019) (three hours over three years); Boone v. PrimeFlight Aviation Services, Inc., Case No. 15-CV-6077, 2018 WL 1189338 at *8 (E.D.N.Y. Feb. 20, 2018), report and recommendation adopted, Case No. 15-CV-6077, 2018 WL 1187402 (E.D.N.Y. Mar. 7, 2018) ($82.17 over twenty-six months).

The culprits for this systematic underpayment are likely the defendant's no-fault attendance policy, its requirement that its employees clock in at least one minute early (both at the beginning of their shift and for their meal periods)

and its rule that employees punch out no more than seven minutes after their shift is scheduled to end. Even without the data proving the underpayment, these policies result in rounding that benefits only the defendant. The employees are disciplined when the rounding may benefit them. If an employee punches in two minutes after their shift was scheduled to start, having their punch rounded down, they get a Code 8 violation for being late to work. See Dkt. No. 349 at 14. The same is true if they punch out more than seven minutes after their shift was to end, "missing a swipe." Id. As the court in Austin put it, §785.48(b) "does not contemplate the situation where an employer allows rounding when it benefits the employer without disciplining the employee; but disciplines the employee when the rounding does not work to the employer's advantage." 2010 WL 1875811 at *3.

The defendant's *de minimis* arguments are not persuasive. The *de minimis* doctrine "allows employers to disregard otherwise compensable work when only a few seconds or minutes of work beyond the scheduled working hours are in dispute." Kellar, 664 F.3d at 176 (citing Singh v. City of New York, 524 F.3d 361, 370 (2d Cir. 2008)). "When applying the *de minimis* rule to otherwise compensable time, the following considerations are appropriate: (1) the practical administrative difficulty of recording the additional time; (2) the aggregate amount of compensable time; and (3) the regularity of the additional work." Lindow v. United States, 738 F.2d 1057, 1062 (9th Cir. 1984). The regulations state:

> In recording working time under the Act, insubstantial or insignificant periods of time beyond the scheduled working hours,

> which cannot as a practical administrative matter be precisely recorded for payroll purposes, may be disregarded. The courts have held that such trifles are de minimis. (*Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946)) This rule applies only where there are uncertain and indefinite periods of time involved of a few seconds or minutes duration, and where the failure to count such time is due to considerations justified by industrial realities. An employer may not arbitrarily fail to count as hours worked any part, however small, of the employee's fixed or regular working time or practically ascertainable period of time he is regularly required to spend on duties assigned to him.

29 C.F.R. §785.47. The defendant bears the burden of showing that the doctrine applies. See Kellar, 664 F.3d at 176. "The *de minimis* exception is not a broad rule granting employees some number of free minutes of labor per day." Eddings v. Health Net, Inc., Case No. CV 10-1744, 2012 WL 994617, at *5 (C.D. Cal. Mar. 23, 2012).

The defendant raises the *de minimis* doctrine in two main ways: (1) the rounding time, offset by walking time, is *de minimis* and (2) the walking time, even if compensable, also is *de minimis*. The defendant's first argument is based on its walking time analysis. It argues that the rounding must be offset by the "duty free" walking time; the court already has analyzed and rejected this argument. But the defendant makes the separate point that "'89.3% of shifts had rounding of less than five minutes and none of the rounding occurred in increments of larger than 10 minutes.' This is the quintessential definition of de minimis impact." Dkt. No. 341 at 20 (citing Kellar, 664 F.3d at 177). Here, the defendant confuses the *de minimis* doctrine with what is considered minimal for rounding. Although courts may use the terms "*de minimis*" or "minimal" when determining whether a rounding time is neutral

under 29 C.F.R. §785.48(b), this is not an application of the *de minimis* doctrine. See Laverenz, 746 F. Supp. 3d at 618. In addition to regularly disregarding the difference between courts analyzing minimalism in the context of rounding neutrality and applying the *de minimis* doctrine, the defendant's *de minimis* arguments misunderstand the doctrine. The defendant argues that the *de minimis* doctrine applies to all sorts of situations, essentially arguing that the *de minimis* doctrine precludes liability when there may be a smallish amount of time at issue, regardless of the context. The doctrine, however, applies to "otherwise compensable time," Lindow, 738 F.2d at 1062, or "insignificant periods of time beyond the scheduled working hours," 29 C.F.R. §785.47.

The defendant cites Kellar to support its claim about what is minimal for rounding purposes, but Kellar is about the compensability of the time employees spent preparing for their shift; it has nothing to do with rounding. See Kellar, 664 F.3d at 174. The defendant does the same with Mitchell, 745 F.3d at 838, a case about the compensability of time spent donning and doffing protective gear. The defendant uses this case to support its argument that the rounding time is minimal. Dkt. No. 341 at 17.

The defendant's claim that 89.3% of shifts having rounding of less than five minute is "the quintessential definition of de minimis impact," dkt. no. 341 at 20, does not make the plaintiff's losses from rounding "minimal." It does not matter that most, if not all, of the rounding was less than five minutes. What makes a rounding policy neutral is when it averages out and employees are not

systematically and nonminimally underpaid. Here, the defendant's rounding policy systematically and significantly underpaid the plaintiffs over time.

Turning to its second argument, the defendant argues that even if "this Court were to consider customer conversations during walking time as compensable, this time would be *de minimis* under Seventh Circuit law: The plaintiffs testified under oath that conversations with customers and/or co-workers during walk time were (1) a few minutes at most, and often much shorter, (2) generally infrequent, and (3) sometimes personal in nature." Dkt. No. 341 at 20-21. The defendant again misapprehends the doctrine. The defendant argues that the doctrine should somehow forgive its twenty-nine-minute meal periods and non-neutral rounding policy because the walking time is *de minimis*. The defendant assumes that the doctrine is some kind of buffer for employers that allows them to underpay their employees up to a certain amount as an offset for *de minimis*. But the doctrine is about dealing with periods of *compensable* time that are *not captured*; it is applied to periods like pre- and post-shift activities before or after employees have clocked in. The defendant seeks to apply it to a period during which the employees *are clocked in* and—they admit for argument—*is compensable*. The time is captured. There is no need for the *de minimis* doctrine. The defendant essentially is repackaging its primary activity argument that the walking time should not be compensated into the *de minimis* doctrine; the court does not accept that effort.

The defendant has not carried its burden to show that the *de minimis* doctrine applies. The court will grant the plaintiffs' motion for summary

judgment on the Wyngaard, Hunter and Robertson FLSA Collective time-shaving claims and deny the defendant's motion as to those claims.

5. *Wisconsin and Illinois Time-shaving Claims*

Not surprisingly, both Wisconsin and Illinois law require employers to pay overtime and regular wages. Wis. Stat. §§109.03(1), 109.01(3); 820 ILCS 115/4. The plaintiff argues that neither Wisconsin nor Illinois has a rounding rule analogous to the FLSA. Dkt. No. 380 at 21-25. The defendant argues to the contrary, citing Creal v. Group O, Inc., Case No. 13 C 4275, 2016 WL 3181579, at *2 (N.D. Ill. June 8, 2016) and Quiroga v. Olds Products Co. of Illinois, Case No. 22-CV-390, 2024 WL 4512098, at *5 (E.D. Wis. Oct. 17, 2024). Neither case cited by the defense conclusively holds that the respective state provisions allow rounding. Regardless, the court's analysis above makes the question irrelevant. If the Wisconsin and Illinois laws do not permit rounding, then the defendant violated the respective state law. If the states permit rounding like the FLSA, as the defendant argues, then the defendant still violated the state laws due to its facially neutral rounding policy that actually had the effect of systematically underpaying its employees over long periods. For these reasons, the court will grant the plaintiffs' summary judgment motion as to the WWPCL Time-shaving Subclass, the IWPCA Time-shaving Subclass and IMWL Time-shaving Subclass time-shaving claims and deny the defendant's motion as to those claims.

## VI. Consolidation

The parties previously requested that this court consolidate Robertson with Wyngaard and Hunter for pretrial proceedings. See Dkt. No. 232 at 4. The court granted the parties' request to consolidate these three cases through dispositive motions. Dkt. No. 234 at 6. As for Wyngaard and Hunter, the court agreed with the plaintiff that joining these two cases for trial had the potential to cause jury confusion. See Dkt. No. 230 at 15. Wyngaard and Hunter raise different claims, involve different state statutes and have different classes that would be challenging for a jury to keep straight and produce verdicts that could be clearly understood by the parties. Id.

With the court's resolution of the parties' dispositive motions, there is no need to maintain the consolidation of these three cases. Accordingly, the court will unconsolidate Wyngaard, Hunter and Robertson. The court will direct the clerk to reassign Robertson to Judge Stadtmueller and reassign Hunter to Judge Ludwig. The court will set a scheduling conference in Wyngaard to determine dates for a pretrial conference and trial.

## VII. Conclusion

The court **GRANTS IN PART AND DENIES IN PART** the defendant's motion for partial summary judgment. Dkt. No. 340.

The court **GRANTS IN PART AND DENIES IN PART** the plaintiffs' motion for partial summary judgment. Dkt. No. 344.

The court **ORDERS** that Wyngaard v. Woodman's Food Market, Inc., Case No. 19-cv-493-pp; Hunter, *et al.* v. Woodman's Food Market, Inc., Case

No. 21-cv-94-pp and Robertson, *et al.* v. Woodman's Food Market, Inc., Case No. 22-cv-207-WED are **UNCONSOLIDATED**.

The court **DIRECTS** the clerk to reassign Robertson, *et al.* v. Woodman's Food Market, Inc., Case No. 22-cv-207, back to Judge Stadtmueller and to reassign Hunter, *et al.* v. Woodman's Food Market, Case No. 21-cv-94 back to Judge Ludwig.

The court **ORDERS** that the parties in Wyngaard must appear for a telephonic status/scheduling conference on **November 16, 2026 at 2:30 PM (Central Time)** to discuss next steps. The parties are to appear by calling the court's conference line at 551-285-1373 and entering Meeting ID 161 4901 8989 and Passcode 190021 when prompted.

Dated in Milwaukee, Wisconsin this 30th day of September, 2026.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**United States District Judge**